**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

MICHAEL D. BARNES,
*Defendant-Appellant*.

No. 11-30107

D.C. No.
3:09-cr-00001-
TMB-1

OPINION

Appeal from the United States District Court
for the District of Alaska
Timothy M. Burgess, District Judge, Presiding

Argued and Submitted
August 28, 2012—Anchorage, Alaska

Filed April 18, 2013

Before: Michael Daly Hawkins, M. Margaret McKeown,
and Carlos T. Bea, Circuit Judges.

Per Curiam Opinion

**SUMMARY**[*]

---

### Criminal Law

The panel reversed a drug conviction in a case in which the district court denied a motion to suppress statements the defendant made to FBI agents during a meeting with his parole officer.

The panel held that the meeting was a custodial interrogation, and that the agents engaged in a "two-step interrogation" prohibited by *Missouri v. Seibert*, 542 U.S. 600 (2004), deliberately delaying giving *Miranda* warnings to induce the defendant's cooperation in an ongoing investigation.

The panel wrote that although the target of the agents' inquiry was ostensibly another suspect, the questioning necessarily elicited information that incriminated the defendant, and that the mid-stream warnings provided after the defendant incriminated himself were too little, too late.

The panel concluded that because the confession was central to the conviction, the error was not harmless.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Darla J. Mondou (argued), Marana, Arizona, for Defendant-Appellant.

Karen L. Loeffler, United States Attorney, and Erin White Bradley (argued), Special Assistant United States Attorney, United States Attorneys' Office, Anchorage, Alaska, for Plaintiff-Appellee.

**OPINION**

PER CURIAM:

Michael D. Barnes appeals his conviction for distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). Reviewing de novo, *United States v. Rodgers*, 656 F.3d 1023, 1026 (9th Cir. 2011), we consider the denial of Barnes's motion to suppress statements he made to Federal Bureau of Investigation ("FBI") agents during a meeting with his parole officer. Because the meeting was a custodial interrogation, *Miranda* warnings were required to allow the prosecution to use Barnes's statements at trial. Engaging in a "two-step interrogation" prohibited by *Missouri v. Seibert*, 542 U.S. 600 (2004) (plurality opinion), the agents deliberately delayed giving warnings to induce Barnes's cooperation in an ongoing investigation. Although the target of the agents' inquiry was ostensibly another suspect, the questioning necessarily elicited information that incriminated Barnes. The mid-stream warnings provided after Barnes incriminated himself were too little, too late. The district court's failure to suppress the statements was in error. At trial the confession was central to the conviction. Because

the error was not harmless beyond a reasonable doubt, we reverse Barnes's conviction.[1]

## BACKGROUND

In 2007, FBI agents were investigating an alleged drug trafficker named Esthepen Pebenito. FBI Agent John Eckstein recruited an informant, George Craig, who arranged to obtain illegal drugs from Barnes at the Anchorage, Alaska airport for transport to Pebenito in Hawaii. Craig made the arrangements on a recorded telephone call. The FBI agents did not make it to the airport in time to either search Craig before the transaction with Barnes or to monitor the transaction. When the agents finally arrived, they met with Craig, who gave them a package of methamphetamine he allegedly received from Barnes.

A few months later, at the request of the FBI agents, Barnes's parole officer, Andrea Kuckertz, scheduled a meeting with Barnes. She did not inform Barnes, who was required by the terms of his parole to attend the meeting, that FBI agents would be there. Kuckertz normally meets with parolees at the window to the lobby of her office, without requiring them to be searched or escorted into the secure area. However, upon arrival at the parole office, Barnes was searched and escorted into the interior of the building through an electronically locked door.

When Barnes arrived at Kuckertz's office, he found two FBI agents waiting to question him about the transaction with Craig. The agents did not immediately advise Barnes of his

---

[1] In light of this reversal, we do not reach Barnes's appeal of other claimed errors at trial.

*Miranda* rights. Instead, the agents told Barnes that they knew he had been involved in drug distribution at the Anchorage airport. Barnes denied the allegations. The agents then played a portion of one of the recorded phone calls between Barnes and Craig. After hearing the recording, Barnes admitted he remembered the transaction with Craig. Because Agent Eckstein thought Barnes "looked like he was going to continue talking," the FBI agents advised Barnes of his *Miranda* rights. Barnes waived his rights, and then confessed his involvement in the drug transaction. The indictment on drug charges soon followed.

Before trial, Barnes filed a motion to suppress his statements and the tangible evidence of the drugs Craig delivered to the FBI agents. The district court found that Barnes was subject to interrogation before the agents administered *Miranda* warnings and that the agents should have known their questions could elicit an incriminating response. Nonetheless, the district court found that Barnes was not in custody when this pre-*Miranda* warning interrogation occurred and that the post-*Miranda* incriminating statements were voluntarily made after the warnings were administered.

## ANALYSIS

Our initial consideration of the *Miranda* issue rests on the resolution of two questions: whether the interrogation was custodial and whether the interrogation was a "deliberate two-step" approach in contravention of *Missouri v. Seibert*. If the answers are in the affirmative, we must then determine the effectiveness of mid-stream warnings. If the mid-stream warnings were ineffective, we must determine whether the erroneous admission of the inculpatory statements was

harmless. *United States v. Williams*, 435 F.3d 1148, 1161–62 (9th Cir. 2006).**[2]**

## I. CUSTODY

The touchstone for *Miranda* warnings is whether the suspect is in custody when interrogated. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). To determine whether an individual was in custody, we must decide whether a reasonable person in the circumstances would have believed he could freely walk away from the interrogators. *See United States v. Kim*, 292 F.3d 969, 973–74 (9th Cir. 2002). The following factors are pertinent in assessing the custody question: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *Id.* at 974 (internal quotation marks and citations omitted). The first four factors weigh heavily in favor of determining that Barnes was in custody.

---

**[2]** Apart from the issue of custodial interrogation, Barnes also argues that the terms of his parole created a "penalty situation" in which he was required to cooperate with the agents and truthfully answer inquiries, thereby incriminating himself, or face revocation of his parole. Because Barnes was subject to custodial interrogation—rather than merely questioned in a probationary setting—and the resulting statements are inadmissible, we do not resolve whether the terms of his parole created a penalty situation. *See Minnesota v. Murphy*, 465 U.S. 420, 429 n.5 (1984) (addressing a penalty situation but noting that "[a] different question would be presented if [the probationer] had been interviewed . . . by the police themselves in a custodial setting").

To begin, Barnes did not appear voluntarily but rather was told to appear for a meeting with his parole officer under threat of revocation of parole. *Cf. Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). The meeting was not his regularly scheduled weekly meeting on Thursday afternoons but was set for a Wednesday. Kuckertz misrepresented the purpose of the meeting and did not respond when Barnes called seeking to reschedule. Kuckertz acknowledged that it was unusual for her to see Barnes on a day other than Thursday, and that when she opted not to return his calls, she knew that Barnes was aware that failure to appear at the meeting would be a violation of his parole.

The FBI agents directly confronted Barnes with evidence of guilt before administering the *Miranda* warnings. They spent several minutes questioning Barnes, told him they had evidence he had met Craig at the airport, and played a tape recording of an incriminating phone call between Barnes and Craig.

This confrontation occurred with three law enforcement officials in a small office, behind a closed door, inside the Alaska Department of Corrections Probation building. Normally, Barnes's parole meetings occurred through a window in the lobby, but on this occasion he was searched and escorted through an electronically locked door where he was surprised by the FBI agents waiting to question him.

Nor was the approximately two hour meeting a typical parole check in. Normally Kuckertz meets with her parolees only briefly. Although the *Miranda* warnings were given after about ten to twenty minutes, the meeting was anything but a run-of-the-mill parole update. *See Kim*, 292 F.3d at 977

(finding an interrogation lasting approximately one hour to be suggestive of custodial circumstances).

The fifth factor, the degree of pressure applied to detain Barnes, is neutral at best. Although Barnes was in a police-dominated, confined environment in which his presence was mandated by his parole terms, he was not handcuffed, arrested, or physically intimidated in any way. Even so, the scenario was not without pressure resulting from a combination of the surroundings and circumstances encompassed by the other factors. Taking into consideration all of the factors, particularly the role of the FBI agents and the location and duration of the interrogation, we hold that a reasonable person in Barnes's circumstances would not have felt free to leave. Thus, Barnes was in custody during the interrogation.

## II. DELIBERATE DELAY IN PROVIDING *MIRANDA* WARNINGS

When a law enforcement officer interrogates a suspect in custody but does not warn the suspect of his *Miranda* rights until after he has made an inculpatory statement, the inquiry is whether the officer engaged in "a deliberate two-step interrogation." *Williams*, 435 F.3d at 1150. Such an interrogation occurs when an officer deliberately questions the suspect without *Miranda* warnings, obtains a confession or inculpatory admission, offers mid-stream warnings after the suspect has admitted involvement or guilt, and then has the suspect repeat his confession or elaborate on his earlier statements. *Id.* at 1159–60. If the FBI agents "deliberately employed the two-step strategy," we then "evaluate the effectiveness of the midstream *Miranda* warning to determine

whether the postwarning statement is admissible." *Id.* at 1160 (citing *Seibert*, 542 U.S. at 615).

The evidence reflects that the agents deliberately employed the two-step interrogation tactic. In reaching this conclusion, we "consider whether objective evidence and any available subjective evidence, such as an [agent's] testimony, support an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning." *Id.* at 1158.

Agent Eckstein testified that he was familiar with *Miranda*'s requirements, believed Barnes would think he was not free to leave the meeting, and intended to question Barnes about his involvement in a crime. He further stated that the agents played the recorded phone conversation to demonstrate that they "were investigating [Barnes]," because "unless he believed that[,] he would not cooperate" with the agents and "would not talk to [them]." Agent Eckstein explained that he did not give the warnings at the beginning of the meeting because he "wanted to allay any concerns [Barnes] had that he was being arrested that day":

> A: We could have [*Mirandized* Barnes at the beginning of the meeting], but it's been my experience that . . . when you *Mirandize* somebody . . . they think they're under arrest because they equate being *Mirandized* with being under arrest. And so we were trying to convince him that he was not going to be arrested that day . . . . So I felt like, well, on the one hand we're saying Mr. Barnes, you're not under arrest, we're here to get your cooperation . . . . [H]ad he just walked in and

we immediately *Mirandized* him, it would've
. . . seemed to him that he was under arrest.

Whether the agents planned to arrest Barnes forthwith or to turn him into a cooperating witness is not the bellwether for administering *Miranda* warnings. The simple reason the agents delayed was so that Barnes would talk to them about *his* role in the drug transaction. It is the agents' interrogation of Barnes to this end in a custodial setting that triggers the need for *Miranda* warnings, where, as here, the suspect's statements are later proffered against him at trial.

The agents made a deliberate decision not to warn first, but instead to confront Barnes with accusations of guilt and the tape recording. Agent Eckstein's testimony was clear on this point:

Q: Okay. But you didn't . . . confront him with something to the effect of we know you know about crimes that *others* committed, did you? In fact, . . . you confronted him with we know *you* committed a crime?

A: Initially. And the plan certainly was after we talked to him about that and he agreed to cooperate[,] we were going to then question him about his associates. (Emphasis added.)

Agent Eckstein feared that if Barnes heard the warnings, he would be less willing to talk about the suspect that the agents were targeting. That the ultimate goal of the interrogation was apparently to gather information to charge Pebenito, rather than to charge Barnes, does not sanction the agents' decision to delay *Miranda* warnings. The two-step tactic

necessarily elicited inculpatory information about Barnes's transactions with Pebenito, and thus necessarily inculpated Barnes. Indeed, at one point, the agents told Barnes he could be prosecuted and that it was not their decision whether he would be charged. The agents deliberately withheld the warnings to prevent Barnes from being aware that he had entered a phase of the adversary system, in direct contravention of one of *Miranda*'s key goals. *See Miranda v. Arizona*, 384 U.S. 436, 469 (1966).

### III.   EFFECTIVENESS OF MID-STREAM *MIRANDA* WARNINGS

*Williams* counsels us to evaluate the mid-stream warnings under the following framework:

> (1) [T]he completeness and detail of the prewarning interrogation, (2) the overlapping content of the two rounds of interrogation, (3) the timing and circumstances of both interrogations, (4) the continuity of police personnel, (5) the extent to which the interrogator's questions treated the second round of interrogation as continuous with the first[,] and (6) whether any curative measures were taken.

*Williams*, 435 F.3d at 1160.

The agents' initial round of interrogation was specific and complete. Their questions and accusations touched upon the timing, location, and drugs involved in the disputed transaction, including Barnes's role in the transaction. Similarly, Barnes's pre-warning responses were specific.

According to Kuckertz and Agent Christopher Jones, Barnes admitted involvement in the Anchorage transaction prior to the warnings. That admission should have been no surprise to the FBI agents given the nature of the questioning and the use of the recorded phone call.

The subject of the pre- and post-warning confession differed only slightly with respect to the transaction at the Anchorage airport. Pre-warning, Barnes admitted to his involvement in the Anchorage transaction but did not describe it in detail. Post-warning, he elaborated on his relationship with Pebenito and how the two had dealt drugs, mentioned several other drug transactions, and described the Anchorage transaction in greater detail.

There was no break or dividing point in the interrogation. Barnes was interrogated in the same place before and after the warnings. After Barnes waived his rights, the agents immediately resumed the interrogation and continued questioning Barnes for approximately two hours. The agents apparently stopped only long enough to read Barnes the "advice of rights" form and allow him to waive his rights.

The agents treated the second round of interrogation as continuous with the first—the second round was not a distinct phase to be distinguished from the initial; it was a mere continuation of the interrogation already underway. The process was a seamless one, with the same agents interrogating Barnes before and after the warnings. Kuckertz's testimony highlighted the unbroken stream of testimony:

> A: The agents started explaining why they
> were there and that they had information that

> [Barnes] was involved with drug dealing. [Barnes] initially denied that and then they played a recording that they had in which you could hear him speaking . . . . And he then admitted that he was involved in that incident that they were questioning him about. And at that point they *Mirandized* him[,] and he was willing to *further discuss* what had happened. (Emphasis added.)

This timing particularly reduces the impact of the recitation of constitutional rights. *See Seibert*, 542 U.S. at 613 ("Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent . . . ."). It is clear that Barnes admitted his involvement in the crime before he received the warnings and that his post-warning confession was merely an elaboration on his pre-warning admission of guilt.

Finally, the agents took no curative measures to mitigate their error. They did not, for example, take a substantial time break in the interrogation or warn Barnes that what he had said before the warnings could not be used against him. *See id.* at 616. ("When the same officer who had conducted the first phase recited the *Miranda* warnings, he said nothing to counter the probable misimpression that the advice that anything Seibert said could be used against her also applied to the details of the inculpatory statement previously elicited. In particular, the police did not advise that her prior statement could not be used."); *id.* at 622 (Kennedy, J., concurring in the judgment) ("Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient."); *see also Williams*, 435 F.3d at

1161 (recognizing that a break in time between two interrogations could serve as an appropriate curative measure). Taken together, these factors demonstrate that the warnings Barnes received were not effective and that his post-warning confession should have been suppressed.

## IV.  HARMLESS ERROR

The final issue we consider is the effect of Barnes's admissions on the verdict. "On direct review, the government's commission of a constitutional error requires reversal of a conviction unless the government proves beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Williams*, 435 F.3d at 1162 (internal quotation marks and citation omitted). The government does not argue that if the confession was improperly admitted the error was harmless. Rightly so: "A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (internal quotation marks and citation omitted). Admission of a confession "will seldom be harmless." *Williams*, 435 F.3d at 1162. Here, the confession went to the heart of the case. Barnes was charged with and convicted of methamphetamine distribution at the Anchorage airport in May 2007; he admitted that precise crime both before and after he received the *Miranda* warnings. The erroneous admission of the confession was not harmless.

**REVERSED.**