# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

THE STATE OF WASHINGTON,  )
                                )     No. 76108-1-I
         Respondent,  )
                                )     DIVISION ONE
        v.                  )
                                )     UNPUBLISHED OPINION
CHARLES JEROME COURTNEY,  )
                                )
        Appellant.    )     FILED: April 23, 2018
                                )

APPELWICK, J. — Courtney was convicted of first degree murder and possession of heroin with intent to distribute. He argues that police elicited statements from him in violation of Miranda,[1] and that the trial court erred in its jury instructions. We affirm.

## FACTS

The State charged Charles Courtney with the murder of Anthony Boro, and possession of heroin with intent to manufacture or deliver. The charges arose out of events occurring on October 5 and 6, 2015. On the evening of October 5, Boro, along with friends, went to Courtney's apartment complex. According to Courtney, that night an unknown person tried to open the door to his apartment, and Courtney and Jesse Landrum ran after him into the parking lot.

Courtney told police that the person, later identified as Boro, was running away from him. While Boro was running away in the parking lot, Courtney stopped,

---

[1] Miranda v. Arizona, 384 U.S. 436, 478-79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

pulled out his gun, and fired once. According to Courtney, Boro was about 20 feet away when he shot him in the back. After being shot in the back, Boro fell to the ground and died. Police determined, after doing a walkthrough of the apartment complex, that Courtney was about 80 feet away from Boro.when he shot him.

In the preceding weeks, various people, including runaway teenagers, had been staying at Courtney's apartment. One of the people staying with Courtney was Lauren Tomita. Michael Knierim also spent one night at the apartment. Knierim got into an argument with Courtney over Knierim's interaction with Tomita. Courtney and Knierim threatened each other in text messages and over the phone.

On October 5, 2015, Knierim was spending time with Boro, Isadora Nogales, and Sea-Land Ly, driving around in Nogales's car. That evening, they ended up at the park at Martha Lake. Across the street from the park was the apartment complex where Courtney lived. Ly testified that he and Knierim went to the apartments to purchase drugs from Courtney. Ly also testified that Boro said he wanted to rob Courtney. Ly, Knierim, and Boro were walking toward the apartments, but decided to leave when they saw Tomita, and whom they thought was Courtney or another one of his friends, outside.

Ly got into Nogales's car and they left the area. Another car picked up Knierim, and the two cars met at apartments on Casino Road. They realized that Boro was not in either car.

Police responded to a 911 call shortly before 1:00 AM on October 6. The responding officers arrived at the Altia Apartments and found Boro deceased, laying in the parking lot. Deputy Christopher Veentjer arrived at the apartments

2

just after 6:00 AM to do scene security, which included asking residents in the area if they had seen or heard anything. At one point, Deputy Veentjer asked detectives on the scene to speak to two people who said that they had heard something regarding the incident.

Detective Brad Pince spoke with one of the individuals, who identified himself as Courtney. Detective Pince asked Courtney if he would mind walking with him to his vehicle so they could talk privately, and Courtney agreed. Initially while they talked, Detective Pince and Courtney stood in front of Pince's truck. They talked for approximately 30 minutes outside of Pince's truck. Detective Dave Bilyeu was also there for most of the conversation. Courtney told Pince some information that Pince thought was relevant to the investigation, so Pince asked Courtney if he could record a statement. Courtney agreed. Pince asked Courtney to get into his truck to make it easier to hear the conversation on the recorder. Pince testified that Courtney did so voluntarily.

While in the truck, Pince sat in the driver's seat and Courtney sat in the front passenger seat.[2] Pince and Courtney were the only ones in the truck. The doors were closed and unlocked. After asking Courtney information about his identity, Detective Pince asked Courtney:

> Det. Pince: [Y]ou understand that, that you're here on your own free will and you're free to go any time? You don't have to give me a statement? Do you understand that?

---

[2] In the transcript of Pince's recorded conversation with Courtney, Pince states to Courtney, "[Y]ou're sitting on the driver's side." In his testimony, Pince clarified that it was a misstatement during the recording, and Courtney was on the passenger side.

3

Mr. Courtney: I didn't know that. No, sir.

Det. Pince: 'kay. . . . are you willing to give me a statement freely and voluntarily at this point?

Mr. Courtney: Yes, sir.

Det. Pince: N'kay. That . . . and we're sittin' in a vehicle but, but you're sitting on the driver's side and the door's unlocked and you can get out and go any time you want to. Is that accurate?

Mr. Courtney: Yes, sir.

(Boldface omitted.)

About 30 minutes into the recording, Detective Bilyeu returned to Pince's truck. In Pince's four door truck, Bilyeu sat in the back seat on the passenger side, directly behind Courtney. Bilyeu told Courtney that one of the teenagers staying with him said Courtney was the shooter. Courtney told the detectives that he was not the shooter. Then there was the following exchange:

Det. Bilyeu: Where's the gun?

Mr. Courtney: What? I don't have a gun, sir.

Det. Bilyeu: I didn't ask you if you have a gun. I asked you, where is the gun?

Mr. Courtney: I don't know where the gun is, what like, the pistol that he would have would be on him, most likely. And he left earlier. He left right before I left.

Det. Bilyeu: Well, Lead Detective Conley has probably [sic] cause for your arrest for murder.

Mr. Courtney: Well, I . . . you said I could leave in ten minutes and I'm coming back to the apartments anyways.

(Alteration in original.)

4

At this point, Detective Pince attempted to wrap up the interview:

Det. Pince:  'kay.  Step out.  Let's stop this ah, recording for a second here. . . .

Mr. Courtney:  But he said that I could leave in ten minutes.  You lied to me.

Det. Pince:  The time is now 0835

Mr. Courtney:  No.

Det. Pince:  . . . hours . . .

Mr. Courtney:  That's not fair.  Okay.  Okay.  Wait though, wait then, wait, wait, wait, wait, wait, please.  Wait, fine.  Fine.  I heard someone was tryin' to . . . hurt me and my family . . . me and the people inside the place.  This guy, 2-0-6, that Payton knows.

Det. Bilyeu:  Maybe we should turn the recording back on.

Det. Pince:  The recording's still going.

Det. Bilyeu:  Alright.

Mr. Courtney:  Payton's uncle, a guy named 2-0-6, was trying to kill me.  He was trying to rob me.  That's what they were [telling] me.  And it's what people were saying.  So I went to get a pistol because I didn't want to get, I didn't want to get killed. . . . And then all this happened and then that guy was trying to get into my house.  He was the . . . door was jiggling so I called Jesse. . . . And then when I opened the door he started running away.  So I went after him.  I had Jesse loop around the back and I shot him because I didn't want him to get away and I didn't want him, I didn't want it to happen ever again.

(Some alterations in original.)

The officers asked Courtney for more details.  Courtney answered that the man he shot was trying to break into his house.  Then, Courtney stated that he

5

wanted to get cigarettes because he said he knew he was going to "get cuffed." Pince replied that they were not going to have cigarettes yet, and that he wanted to clarify what happened. Courtney stated, "You lied before. I'd like it now before I go further." Pince asked him, "[A]re you telling me you don't want to talk anymore?" Courtney said he wanted to talk, and answered a few more questions. Courtney stated more than once that he wanted a cigarette, and then stated that he wanted to talk to his girlfriend, Eileen. Pince replied, "That's not gonna happen. You either talk to us now or you don't." Courtney said he was going to kill himself, but then continued to answer Pince's questions. After Pince began asking about the gun again, Courtney stated, "I can kill myself with the pill I have in my hand." At that point, Pince testified,

> I grabbed his arm. And then there was a little bit of a struggle and I took a gun off him, so there was some physical contact at that point. He was then moved from my vehicle and placed in handcuff [sic].

The officers arrested Courtney, and Bilyeu read him the Miranda warnings. Miranda v. Arizona, 384 U.S. 436, 478-79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Courtney voluntarily waived them. The officers resumed the recording and Courtney gave the officers more details about the shooting.

At the pretrial hearing under CrR 3.5, the court determined that Courtney's statements to Pince and Bilyeu, both before and after the Miranda warnings, were knowing, voluntary, and admissible.

Courtney was charged with one count of first degree murder and one count of possession of heroin with intent to manufacture or deliver. The jury found

Courtney guilty on both charges. The court imposed a standard range sentence with firearm enhancements for both counts. Courtney appeals.

## DISCUSSION

Courtney makes four arguments. First, he argues that the court should have suppressed the statements he made before the police advised him of his Miranda rights, because he was in custody. Second, he argues that the court should have suppressed his statements after the Detective gave the Miranda warnings, because they violate the two-step interrogation test of Missouri v. Seibert, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004). Third, he argues that the court's error in admitting his statements was not harmless, and that the error requires this court to reverse his conviction. Fourth, he argues that the jury instructions were ambiguous regarding self-defense and the duty to retreat, also requiring reversal.

### I. _Miranda_ Rights

Courtney argues the trial court erred when it admitted statements he made to police in a custodial interrogation before the police advised him of his rights under Miranda.

The United States Supreme Court has held that when the authorities take an individual into custody or otherwise deprive him of his freedom, it jeopardizes the privilege against self-incrimination. Miranda, 384 U.S. at 478. Under Miranda, before questioning a person, authorities must warn him that he has the right to remain silent, that anything he says can be used against him in a court of law, that

he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him if he so desires. Id. at 479.

If police conduct a custodial interrogation without Miranda warnings, statements made by the suspect during the interrogation must be suppressed. Id. To determine if a person was in custody, the court uses an objective test: whether a reasonable person in the individual's position would have felt that his or her freedom was curtailed to the degree associated with a formal arrest. State v. Heritage, 152 Wn.2d 210, 218, 95 P.3d 345 (2004). The defendant must show some objective facts indicating his or her freedom of movement was restricted or curtailed. State v. Lorenz, 152 Wn.2d 22, 37, 93 P.3d 133 (2004). This court reviews a trial court's custodial determination de novo. Id. at 36.

A. Custodial Interrogation

Here, Courtney argues that his encounter with detectives became a custodial interrogation when he was sitting in Detective Pince's vehicle and Detective Bilyeu told him that there was probable cause to arrest him for murder. Distinguishing this case from Berkemer v. McCarty, 468 U.S. 420, 104 S. Ct. 3138, 82 L. Ed. 2d. 317 (1984), he argues that he was in a police dominated atmosphere. And, he contends that a reasonable person would have believed himself to be under arrest after learning the police had probable cause to arrest him.

In Berkemer, the Supreme Court held that the atmosphere surrounding an ordinary traffic stop is substantially less police dominated than that surrounding the kinds of interrogation discussed in Miranda. 468 U.S. at 438-39. Courtney contends that the scene of a homicide investigation is a more police dominated

atmosphere than a traffic stop. In State v. Ferguson, this court declined to find a custodial interrogation in the investigation of a vehicular homicide. 76 Wn. App. 560, 567-68, 886 P.2d 1164 (1995). There, this court noted that the seriousness of the potential traffic charge did not alter the analysis. Id. at 567. The mere fact that the police were investigating a homicide when questioning Courtney does not require this court to find that he was in custody.

Then, Courtney contends that he was in custody after Bilyeu told him a witness had identified him as the shooter and there was probable cause to arrest him for murder. He cites to non-Washington cases to support his argument that when police inform the person there is probable cause to arrest, this weighs heavily in favor of finding the person was in custody.

First, he relies on State v. Pitts, 936 So.2d 1111 (Fla. Dist. Ct. App. 2006). There, the court stated that "if a reasonable person in the suspect's position would understand that the police have probable cause to arrest the suspect for a serious crime such as murder or kidnapping, that circumstance militates strongly toward the conclusion that the suspect is in custody." Pitts, 936 So.2d at 1128 (footnote omitted). But, the court found that because police confronted Pitts with only a bare uncorroborated accusation that he had killed the victims—without any details concerning how, when, or where the crime was committed—it was not readily apparent that the detectives considered him the prime suspect. Id. And, even if a reasonable person in Pitts's position would have understood from what the officers said that he was a prime suspect, that would not be, in itself, dispositive of the custody issue. Id.

9

The uncorroborated accusation in Pitts resembles what police told Courtney here. In Pitts, during an interview with the suspect, police wrote down on a notepad, " 'TJ says Sammy killed these guys,' " (a false accusation against Pitts, the suspect). 936 So.2d at 1119. The officer intentionally left the notepad for Pitts to see it. Id. Here, the police told Courtney that a teenage witness, someone Courtney had known for about a week, said that he was the shooter. As in Pitts, this was an uncorroborated accusation that lacked details, and one that would not lead a reasonable person in Courtney's circumstances to understand that he was in custody.

Second, Courtney relies on State v. Schwerbel, 233 Or. App. 391, 226 P.3d 100 (2010). Article I, section 12 of the Oregon State Constitution requires that police give a suspect Miranda warnings when police interrogation occurs under " 'compelling' " circumstances or when that suspect is in full custody. Schwerbel, 233 Or. App. at 395 (quoting State v. Shaff, 343 Or. 639, 645, 175 P.3d 454 (2007)). A suspect is placed in compelling circumstances when a reasonable person in the suspect's position would have felt compelled to answer a police officer's questions. Id. In Schwerbel, the court's Miranda analysis centered on whether the police interrogation of the suspect occurred under "compelling circumstances." Id.

Conversely, the protection provided by article 1, section 9 of the Washington State Constitution is coextensive with that provided by the Fifth Amendment. State v. Unga, 165 Wn.2d 95, 100, 196 P.3d 645 (2008). Washington courts consistently hold that Miranda warnings are required when a reasonable person would believe

he was in police custody to a degree associated with formal arrest—not when a person would have felt compelled to answer a police officer's questions. See Lorenz, 152 Wn.2d at 36-37. Thus, the analysis in Schwerbel is not persuasive here.

Third, Courtney cites to United States v. Lee, 699 F.2d 466 (9th Cir. 1982). In Lee, two agents interrogated the defendant in a closed FBI car for well over an hour, as investigators were in and around his house. Id. at 468. The court affirmed the district court's finding that the defendant was in custody, because a reasonable innocent person in that circumstance could conclude that he was not free to leave. Id. Notably, the court sustained the suppression under the clearly erroneous standard, finding that the district court held a reasonable view of the evidence. Id.

This case differs factually from Lee because, here, police were not searching Courtney's apartment at the time of the questioning. Moreover, in a later decision, the 10th circuit found that Lee was decided under an outmoded standard of review. United States v. Jones, 523 F.3d 1235, 1242 n.2 (10th Cir. 2008). The Jones court noted that under Berkemer the question is not whether a reasonable person would believe he was not free to leave, which was the question the Lee court asked. Id. Instead, the proper inquiry is whether such a person would believe he was in police custody of the degree associated with formal arrest.[3] Id.

---

[3] Believing one was free to leave might be dispositive of the question of whether the person believed he or she was in custody. But, the converse, believing that one was not free to leave, would not necessarily establish that the person was in custody to the degree associated with formal arrest. See generally 2 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 6.6(c) (4th ed. 2017) (noting that the Supreme Court has adopted an objective standard; determining whether the

Courtney argues that he was in custody when the detectives confronted him with probable cause to arrest him for murder. The only relevant inquiry is how a reasonable person in the suspect's position would have understood his situation. State v. D.R., 84 Wn. App. 832, 836, 930 P.2d 350 (1997). Thus, it is irrelevant whether the police had probable cause to arrest the defendant, whether the defendant was a focus of the police investigation, whether the officer subjectively believed the suspect was or was not in custody, or even whether the defendant was or was not psychologically intimidated. Id.

This case is similar to Jones. There, after intercepting an iodine package addressed to Jones, agents approached Jones in a parking lot and asked to speak with her. Jones, 523 F.3d at 1237. She agreed to speak in the agent's car. Id. at 1238. Inside the car, an agent told Jones that she was not under arrest, did not have to talk to him, and was free to leave. Id. He told her the door was unlocked. Id. At one point, as in this case, an agent told Jones that he could arrest her based on the iodine package. Id. The encounter lasted about 45 minutes to an hour. Id. The court affirmed the district court's finding that Jones was not in custody when she spoke with the agent in his car. Id. at 1240. The court focused on key factors including: the agent told Jones she was free to leave; it was a less coercive environment; and the lack of police domination in the encounter. See id. at 1240-42.

situation was "custodial" for Miranda purposes will often require a careful examination of all the circumstances of the particular case).

12

Applying these cases and <u>Miranda</u>'s objective standard to these facts, the trial court did not err. Similar to the suspect in <u>Jones</u>, Courtney was not ordered into Detective Pince's truck. Instead, Pince asked to speak with Courtney inside the truck, to facilitate the recording, and Courtney agreed. As in <u>Jones</u>, the detective told Courtney the doors were unlocked, and that he could get out and go at any at time. The conversation in Pince's truck was about 45 minutes long, and the police did not attempt to block or restrain Courtney from leaving until he threatened to kill himself with a pill. At that point, the police had physical contact with Courtney and placed him in handcuffs. Pince also reminded Courtney more than once that he could choose to talk or not.

When Bilyeu joined them in the truck and sat behind Courtney, Bilyeu took his gun out of holster and held it on his leg, but Courtney could not see it. Bilyeu testified that the atmosphere did not change when he joined the truck, and that Courtney's demeanor did not change at all. While Bilyeu told Courtney that there was probable cause for his arrest, neither Pince nor Bilyeu told Courtney that he was going to be arrested. Bilyeu testified that after he told Courtney that there was probable cause for his arrest, Courtney's demeanor did not change, and he continued to answer questions, but was a "little more animated in his innocence." Pince testified, "We asked him questions and got the same answer. We weren't getting him to change his mind, so I was just getting ready to wrap up the interview." Pince tried to end the interview, and have Courtney step out of the vehicle. But, because Courtney said 'no,' told them to wait, and kept talking, Pince

did not end the interview. Then, Courtney stated that he had shot an individual. The decision to continue the interview was Courtney's.

Courtney was not in custody before his confession for <u>Miranda</u> purposes. A reasonable person in his position would not feel his liberty was restricted to a degree associated with formal arrest. The trial court did not err in denying Courtney's motion to suppress his statements before the <u>Miranda</u> warnings.

### B. Post-*Miranda* Statements

Courtney first confessed before the police gave him <u>Miranda</u> warnings. After the police read him the <u>Miranda</u> warnings, he confessed again. Courtney argues that his post-<u>Miranda</u> statements must be suppressed as the result of a deliberate interrogation strategy that the Supreme Court declared unconstitutional in <u>Seibert</u>.

In <u>Seibert</u>, the police deliberately refrained from providing <u>Miranda</u> warnings as part of a "question first" strategy. <u>See</u> <u>542 U.S.</u> at 605-06. Police took Seibert into custody and deliberately withheld the <u>Miranda</u> warnings:

> In arresting her, Officer Kevin Clinton followed instructions from . . . Officer Richard Harahan that he refrain from giving <u>Miranda</u> warnings. After Seibert had been taken to the police station and left alone in an interview room for 15 to 20 minutes, Officer Hanrahan questioned her without <u>Miranda</u> warnings for 30 to 40 minutes.

<u>Seibert</u>, 542 U.S. at 604-05. After Seibert confessed, police advised her of her rights, reminded her of her prior confession, and then went over the same information a second time during a recorded interview, all under the safe harbor of the <u>Miranda</u> warning. <u>Id.</u> at 605. Washington courts have held that the controlling constitutional rule of <u>Seibert</u> is that of Justice Kennedy's concurrence. <u>State v.</u>

Hickman, 157 Wn. App. 767, 774-75, 238 P.3d 1240 (2010). In Hickman, this court recognized that a trial court must suppress post-warning confessions obtained during a deliberate two-step interrogation where the midstream Miranda warning did not effectively apprise the suspect of his rights. Id.

### 1. Preserved Error

Courtney did not cite Seibert in the proceeding below, but he contends that the issue was preserved for appeal because, in his CrR 3.6 motion to suppress, citing State v. Erho, 77 Wn.2d 553, 463 P.2d (1970), he argued that the post-Miranda statements were inadmissible.[4] Alternatively, Courtney contends that if the issue was not preserved for appeal, the court should still address the admissibility of the post-Miranda statements, because it is manifest constitutional error that warrants review under RAP 2.5(a)(3).

In order to preserve error for consideration on appeal, the general rule is that the alleged error must be called to the trial court's attention at a time that will afford the court an opportunity to correct it. State v. Wicke, 91 Wn.2d 638, 642, 591 P.2d 452 (1979). While Courtney did not argue the correct legal standard under Seibert, he did raise the substantive issue that the post-Miranda statements were inadmissible.

To meet RAP 2.5(a) and raise an error for the first time on appeal, an appellant must demonstrate (1) the error is manifest and (2) the error is of

---

[4] Courtney also briefly raised the issue at trial, arguing to the court that "the explicit purpose of not stopping that conversation, arresting him, and informing him of his right to remain silent is the fact that they want to continue eliciting incriminating responses."

constitutional dimension. State v. O'Hara, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). To show the error is manifest the defendant must show actual prejudice. Id. at 99. Prejudice is shown when it is plausible that the claimed error had practical and identifiable consequences in the trial. Id. If the facts necessary to adjudicate the claimed error are not in the record, no actual prejudice has been shown, and the error is not manifest. Id.

The admissibility of a defendant's statements postarrest implicates the Fifth Amendment. See Hickman, 157 Wn. App. at 772-73. Courtney's post-Miranda statements were used at trial. The State, in closing, said,

> He intended to do the very act. What evidence do we have? These are from Mr. Courtney's own mouth, his own words to law enforcement, his own words to Detective Bilyeu, both during a recorded statement and a walk-through that he stopped -- he stopped right by that path, and he waited.

> And why did he wait? Because he knew Jesse Landrum was at the other end. He had told Jesse Landrum to go the opposite direction. So why not? You stand and you wait because you know if the other guy is coming the other way, he's coming back to you.

> He takes a shooting stance. . . This isn't some instantaneous act; he's waiting for a clear shot. He's watching as he runs away from him.

> He pulls his gun out of his holster. Yes, this is quick. Pulling it out, but he even says that he's getting a sight picture, lining him up. And he pulls the trigger as Anthony continues to run away from him.

> His statement to law enforcement . . . I knew I was going to hit him. What better statement of your intent when you pull the trigger, knowing that you're going to hit someone?

These comments closely mirror Courtney's post-Miranda statements:

> Mr. Courtney: I stopped at the . . . there's like a pathway . . . where the cars park on one side, . . . he runs down there. I'm like, Jesse go right side. So Jesse goes through

and I wait. And when he comes out that side he has his hand out and I don't know what he's grabbing. I pulled out my pistol from the holster that I have and then I shoot so that I wouldn't like, I didn't want to get shot, too. . . .

. . . .

Det. Bilyeu: So this guy, was he running away from you?

Mr. Courtney: Yes, [because] he, he knew I had a, a pistol. . . .

. . . .

Det. Bilyeu: Was he running or walking?

Mr. Courtney: Running. And he was bolting. He was running and I was, I stopped. I'm prior service so my shot . . . I knew I was gonna hit him.

The State used Courtney's statements to argue intent and premeditation. It is plausible that these statements had practical and identifiable consequences at trial. We analyze the issue as manifest constitutional error, and address the substantive issue of whether the admission of the post-Miranda statements violated Seibert.

2. Deliberate Two-Step Interrogation

Courtney argues that Detective Bilyeu made a deliberate choice to engage in a two-part interrogation. Seibert requires a trial court to consider whether objective evidence and any available subjective evidence, such as an officer's testimony, support an inference that the interrogator deliberately employed a two-step interrogation technique to undermine Miranda. Hickman, 157 Wn. App. at 775. The objective evidence includes the timing, setting, and completeness of the

pre-warning interrogation, the continuity of police personnel and the overlapping content of the pre- and post-warning statements. Id.

Detective Pince did not know who had shot Boro when he began the interview with Courtney. He could not have deliberately employed a two-step interrogation before he knew that Courtney was the shooter.

Interrogation refers not only to express questioning, but also to any words or actions on the part of the police, other than those normally attendant to arrest and custody, that they should know are reasonably likely to elicit an incriminating response from the suspect. Rhode Island v. Innis, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). Courtney stated that he had been told he could leave in ten minutes when the interview started, so Pince began to make a record that the interview was ending when Courtney objected and volunteered that he had shot the victim. There is no objective evidence that shows why Pince's attempt to end the interview would elicit an incriminating statement from Courtney. Courtney's confession to shooting the victim was a voluntary statement. After Courtney volunteered that he had shot someone, Pince gave him the choice to keep talking. Pince asked, "[A]re you telling me you don't want to talk anymore?" Courtney replied, "I want to talk. I just want . . . to get stuff." After Courtney was arrested and Bilyeu read the Miranda warnings, Courtney voluntarily waived them.

Courtney relies on State v. Rhoden, 189 Wn. App. 193, 356 P.3d 242 (2015). In Rhoden, police questioned the defendant while he was restrained with handcuffs in his home, before advising him of his Miranda rights. Id. at 196. Police then took him to another area of the home, advised him of his Miranda rights, and

18

questioned him a second time in the same vein. Id. The parties agreed that Rhoden was subject to custodial interrogation both before and after the Miranda warnings, and the court held that the trial court erred in failing to suppress Rhoden's post-Miranda statements. Id. at 199, 202.

Here, Courtney argues that Bilyeu made a similar choice in questioning Courtney when he had probable cause to arrest him, continued to question Courtney after his confession, and then gave him his Miranda warnings. But, in fact, Pince tried to end the interview after Bilyeu told Courtney that there was probable cause for his arrest, but Courtney stopped the detective and voluntarily stated that he had shot someone.

Courtney also cites United States v. Barnes, 713 F.3d 1200 (9th Cir. 2013). In Barnes, the defendant's parole officer summoned him to a meeting where FBI agents confronted him with evidence of his drug distribution and questioned him before advising him of his Miranda rights. See id. at 1203. The court found that Barnes was in custody during the interrogation. Id. at 1205. One of the agents testified that he believed that Barnes would think that he was not free to leave the meeting, and intended to question Barnes about his involvement in a crime. Id. at 1205. The court held that the agents made a deliberate decision to engage in a two-step tactic to contravene Miranda warnings. Id. at 1206.

Courtney argues that the officers here made a similar decision to delay Miranda warnings. But, Courtney was not in a position in which a reasonable person would have felt that his freedom was curtailed to the degree associated with a formal arrest. Thus, he was not in custody when Bilyeu told him there was

19

probable cause for his arrest, and Pince even attempted to end the interview after Courtney responded to Bilyeu's statement. The detectives did not deliberately employ a two-step interrogation to undermine <u>Miranda</u>.

The trial court did not err in admitting the post-<u>Miranda</u> statements.

### 3. Harmless Error

Courtney next argues that the admission of his statements in violation of <u>Miranda</u> and <u>Seibert</u> is a constitutional error that requires this court to reverse his conviction. He argues that the jury would have been far more likely to believe Courtney's self-defense claim without his statements to police. Since we conclude there was no error, we need not address this argument to reach our decision. But, for the sake of completeness we will address it.

A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error. <u>State v. Guloy</u>, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985). If the untainted evidence at trial was so overwhelming that it necessarily led to a finding of guilt, reversal is not required, because there is no reasonable possibility that the use of inadmissible evidence was necessary to reach a guilty verdict. <u>Id.</u> at 426. The State bears the burden of proving a constitutional error harmless beyond a reasonable doubt. <u>Id.</u> at 425.

Here, the evidence clearly established that Courtney was the shooter. At trial, the State admitted into evidence the gun that the officers recovered from Courtney when they arrested him. An officer also testified about the shell casing recovered from Courtney's girlfriend, about four hours after the shooting, that the

20

officers believed came from Courtney's gun. And, other witnesses testified that Courtney admitted he shot someone. Eileen Marasigan, Courtney's fiancée, testified that she heard one gunshot and when Courtney returned to the apartment he said that he "got one of them." Tomita also testified that after Courtney returned to the apartment he said he "might have got my first one," which she clarified meant one "kill" or that he "killed somebody." Andrew Muilenburg testified that Courtney said he shot Boro in the back. Stanley Adams, a medical examiner who examined the victim, testified that the victim was shot in the back, and that the manner of death was homicide. Patrick Guanzon, a resident of the Altia Apartments, testified that he heard a gunshot and saw a man with a gun. Guanzon recognized the man as someone who lived in the apartment across from him. Guanzon testified that he heard the man with a gun say, "I'm going to kill all of you [expletive]." While Courtney's statements to police were a more detailed description of his actions, any reasonable jury would have reached the same verdict with the untainted evidence.

## II.  Jury Instructions

Finally, Courtney contends that this court should reverse his conviction because the jury instructions failed to make it clear that there is no duty to retreat when acting in self-defense. He argues that instruction 23 and instruction 26 were contradictory and likely confused the jury. He asserts that instruction 26 indicated that that there must be no reasonable alternative to the use of force, while instruction 23 indicated that the use of force is lawful even if retreat is a reasonable alternative.

The jury is to presume each instruction has meaning. State v. Hutchinson, 135 Wn.2d 863, 885, 959 P.2d 1061 (1998). Jury instructions, when read as a whole, must correctly tell the jury of the applicable law, not be misleading, and permit the defendant to present his theory of the case. O'Hara, 167 Wn.2d at 105. A jury instruction misstating the law of self-defense amounts to an error of constitutional magnitude and is presumed prejudicial. State v. Walden, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997). The degree of force used in self-defense is limited to what a reasonably prudent person would find necessary under the conditions as they appeared to the defendant. Id. at 474. When instructions are inconsistent, it is the duty of the reviewing court to determine whether the jury was misled as to its function and responsibilities under the law by that inconsistency. Id. at 478.

In instruction 21 (shown in part), the trial court instructed the jury that the homicide was justified if Courtney was acting in self-defense or defense of another:

> The State has the burden of proving beyond a reasonable doubt that the homicide was not justifiable. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.

In instruction 23, the court gave the no duty to retreat instruction:

> It is lawful for a person who is in a place where that person has a right to be and who has reasonable grounds for believing that he is being attacked to stand his ground and defend against such attack by the use of lawful force. The law does not impose a duty to retreat.

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 16.08, at 263-64 (4th ed. 2016) (WPIC).

In number 25, the court also gave the aggressor—defense of self instruction:

> No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense or defense of another and thereupon kill another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense or defense of another is not available as a defense.

WPIC 16.04.

And, in instruction 26, the court gave the jury WPIC 16.05, definition of necessary:

> Necessary means that, under the circumstances as they reasonably appeared to the actor at the time, (1) no reasonably effective alternative to the use of force appeared to exist and (2) the amount of force used was reasonable to effect the lawful purpose intended.

Courtney likens this case to Walden. In Walden, the trial court's jury instructions on great bodily injury could have impermissibly restricted the jury from considering the defendant's subjective beliefs about the possible consequence of an assault by others. 131 Wn.2d at 473. Our Supreme Court held that the instructions were internally inconsistent, and that the definition of great bodily injury in one instruction was a misstatement of the law, requiring reversal. Id. at 478-79.

Here, the State argues that instruction 26 defining "necessary" was given in connection with instruction number 25, the first aggressor instruction. It asserts that the definition of "necessary" defined "necessity" in that instruction. It argues there was no inconsistency and that the instructions properly advised the jury of the law. We disagree.

WPIC 16.05 says to use the "necessary" definition "when the word 'necessary' is used in instructions relating to defenses in WPIC Chapters 16 and 17." WPIC 16.05, note on use at 259. The word "necessary" does not appear in the instructions given in this case. WPIC 16.04.01, Aggressor—Defense of Others, does use the word "necessary" and the note indicates to use WPIC 16.05 (Necessary—Definition) with this instruction. WPIC 16.04.01, note on use at 258. But, this instruction was not given in this case. The court gave WPIC 16.04, Aggressor—Defense of Self, which uses the word "necessity," but the note does not suggest the use of WPIC 16.05 with this instruction. WPIC 16.04, note on use at 256. Therefore, the trial court erred in giving the instruction defining "necessary" from WPIC 16.05.

Courtney asserts that the instruction error is constitutional error that requires reversal. Since the error infringed upon Courtney's constitutional rights, the error is presumed prejudicial, and the State has the burden of proving that the error was harmless. State v. Caldwell, 94 Wn.2d 614, 618, 618 P.2d 508 (1980). The constitutional error cannot be declared harmless unless it was harmless beyond a reasonable doubt. Id. An error in instructions is harmless only if it in no way affected the final outcome of the case. Id.

Courtney contends that there was evidence from which a reasonable jury could have found that the State failed to disprove self-defense beyond a reasonable doubt. First, that he had been informed of a threat that an armed group of men had arrived at his apartment complex. And second, that he told police that he saw Boro reach for his waistband.

But, the overwhelming evidence at trial was that Courtney shot Boro in the back while Boro was running away from him, approximately 70 to 80 feet away. And, according to Courtney, he had chased Boro from his apartment, down stairs, and through the parking lot. No reasonable jury could conclude on these facts that Courtney shot Boro in self-defense. It could not have reached the conflict in the jury instructions. We conclude that, on this record, beyond all reasonable doubt the instructional error was harmless.

We affirm.

Appelwick, J.

WE CONCUR:

Spearman, J.

Leach, J.