FILED
COURT OF APPEALS
DIVISION II

2015 AUG -4 AM 9: 55

STATE OF WASHINGTON
BY_____
DEPUTY

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 45702-4-II |
| Respondent, | |
| v. | PUBLISHED OPINION |
| KIRK W. RHODEN, | |
| Appellant. | |

BJORGEN, A.C.J. — A jury returned a verdict finding Kirk William Rhoden guilty of unlawful possession of a controlled substance (methamphetamine). Rhoden appeals his conviction, asserting that the trial court erred by failing to suppress statements he made to police during what he contends was an improper two-step interrogation procedure. Rhoden also appeals his sentence, asserting that the trial court erred by imposing legal financial obligations without considering whether he had the ability to pay them. We hold that the trial court erred by failing to suppress Rhoden's statements to police and that such error was not harmless. Therefore, we reverse his conviction and remand for a new trial. With this result, we do not reach his challenge to the legal financial obligations.

FACTS

On February 26, 2013, the Pierce County Sheriff's Department, assisted by its Special Weapons and Tactics team, served a search warrant related to an auto theft ring investigation[1] on a residence in Puyallup. Five occupants of the residence, including Rhoden, were restrained with

---

[1] The State did not allege that Rhoden was a participant in the automobile theft ring or that he was a subject of their investigation.

handcuffs. When Deputy Thomas Olesen arrived at the residence later that morning, he questioned the handcuffed occupants in the living room of the home without advising them of their constitutional rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Specifically, Olesen asked the occupants if there were any drugs or guns in the residence. Rhoden told Olesen that "there would be a small amount of drugs in his bedroom and at least [one] gun, if not more." Verbatim Report of Proceedings (VRP) (Nov. 18, 2013) at 93. Olesen then escorted Rhoden to the kitchen and questioned him a second time after advising Rhoden of his *Miranda* rights.

During the post-*Miranda* second interview, Olesen asked Rhoden "[p]retty much" the same questions that he had asked Rhoden in the living room before giving the *Miranda* warnings. VRP (Nov. 18, 2013) at 116. In response to Olesen's post-*Miranda* questioning, Rhoden stated that there was about a gram of methamphetamine located in the dresser on the left side of his bed and that he had been smoking methamphetamine for approximately the last two to three months.

During a search of a bedroom in the home, Deputy Byron Brockway found several items in a dresser, including (1) small baggies containing a substance later tested and confirmed to contain methamphetamine, (2) an electronic scale, (3) glass smoking devices, and (4) documents containing Rhoden's name and the address of the residence being searched.

On February 28, 2013, the State charged Rhoden with one count of unlawful possession of a controlled substance. Before trial, the trial court conducted a CrR 3.5 hearing to determine the admissibility of Rhoden's statements to police. Following the CrR 3.5 hearing, the trial court entered the following unchallenged findings of fact:

1.  On February 26, 2013, deputies from the Pierce County Sheriff's Department served a search warrant at a residence [in] Puyallup, WA. The warrant was served during the early morning hours at approximately 6 or 6:30 a.m.

2.  Upon entry into the residence, deputies found 5-6 individuals. Deputy T. Olesen initially contacted these individuals in the living room of the residence. One of the individuals was identified as the defendant, KIRK W. RHODEN. All of the individuals, including defendant, were in handcuffs at the time.

3.  During the initial contact, defendant made several statements to Deputy Olesen admitting that there was a small amount of drugs in his bedroom along with at least one gun. Defendant was not advised of his constitutional rights prior to making those statements. No threats or promises were made to defendant in order to get him to make these statements.

4.  During this initial contact, the other 4 or 5 occupants of the residence were also present.

5.  Deputy Olesen conducted a more detailed interview of defendant in the kitchen of the residence. This interview occurred prior to the time that deputies began their search of the residence. During this second contact, one other deputy may have been present. None of the other occupants of the residence were present.

6.  Deputy Olesen could not recall whether or not defendant was in handcuffs at the time of this second interview. Deputy Olesen was dressed in plain clothes but was wearing a vest with "Police" or "Sheriff" clearly visible. Deputy Olsen had a firearm with him at the time which was on his right hip.

7.  Prior to asking defendant any questions during the second contact, Deputy Olesen advised defendant of his constitutional rights using a pre-printed "Miranda" card. Deputy Olesen did not utilize a written advisement of rights form to advise defendant of his constitutional rights. Defendant stated that he understood his rights and did not ask Deputy Olesen to clarify those rights. Defendant had no questions regarding the rights that were read to him by the deputy.

8.  Defendant did not appear to be under the influence of any mind or mood-altering substances.

9.  At no time during the interview in the kitchen, did defendant ask for an attorney.

10.  At no time during the interview in the kitchen, did defendant indicate a desire to stop answering questions or speaking with Deputy Olesen.

11.  No threats or promises were made in order to encourage defendant to answer the deputy's questions.

12.  After being advised of his constitutional rights, defendant agreed to answer questions by Deputy Olesen regarding drugs and/or guns which defendant indicated were present in his bedroom.

Clerk's Papers at 95-97. Based on the above findings, the trial court concluded that Rhoden's pre-*Miranda* statements to police were not admissible at trial and that his post-*Miranda* statements to police were admissible at trial.

At trial, Olesen testified about the post-*Miranda* statements Rhoden had made to him in the kitchen, and Brockway testified about the items he found in a dresser in a bedroom of the Puyallup residence. During closing argument, the State argued that Rhoden's statements to Olesen proved that he had constructive possession of the items seized from the bedroom dresser.

The jury returned a verdict finding Rhoden guilty of possession of a controlled substance. As part of Rhoden's sentence, the trial court imposed legal financial obligations, including a $1,000 court appointed counsel fee.

Rhoden appeals.

## ANALYSIS

### I. POST-*MIRANDA* STATEMENTS

Rhoden first asserts that the trial court erred by failing to suppress his statements to police after receiving the *Miranda* advisements. Because the two-step interrogation procedure used here to obtain Rhoden's post-*Miranda* statements failed to apprise Rhoden of information essential to his understanding of his right to remain silent under the Fifth Amendment to the United States Constitution, we hold that the trial court erred by failing to suppress the statements.

The Fifth Amendment to the United States Constitution provides criminal suspects with the right to be free from self-incrimination. *State v. Warner*, 125 Wn.2d 876, 884, 889 P.2d 479 (1995); *State v. Hickman*, 157 Wn. App. 767, 772, 238 P.3d 1240 (2010). Because of the coercive nature of custodial interrogations, law enforcement officers are required to provide a suspect with *Miranda* warnings prior to questioning the suspect in a custodial setting. *Hickman*, 157 Wn. App. at 772. Specifically, the requirements of *Miranda* apply where "a suspect endures (1) custodial (2) interrogation (3) by an agent of the State." *State v. Heritage*, 152 Wn.2d 210, 214, 95 P.3d 345 (2004). Absent effective *Miranda* warnings, a suspect's custodial statements

4

are presumed to be involuntarily given and, therefore, cannot be used against the suspect at trial. *Miranda*, 384 U.S. at 476; *Hickman*, 157 Wn. App. at 772.

The parties agree that Rhoden was subject to custodial interrogations by a law enforcement officer in both the living room and the kitchen to which the requirements of *Miranda* applied. The parties also agree that Rhoden was provided *Miranda* warnings prior to making the statements in the kitchen that were admitted as evidence at his trial. At issue in this appeal is whether those *Miranda* warnings were effective to apprise Rhoden of his Fifth Amendment right to keep silent when he had just provided the same incriminating information in a custodial interrogation for which he was not given *Miranda* warnings.

In *Missouri v. Seibert*, 542 U.S. 600, 604-06, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004), the United States Supreme Court held in a plurality opinion that *Miranda* warnings were ineffective to apprise a suspect of the right against self-incrimination in circumstances similar to those in this appeal. As here, the warnings in *Seibert* were given only after the suspect had confessed during a custodial interrogation without *Miranda* warnings. *Seibert*, 542 U.S. at 604-05. As here, the interrogating officers then provided *Miranda* warnings and again obtained the suspect's confession, without a significant break in time or place and without measures to assure the suspect that her non-*Mirandized* statements could not be used against her in a subsequent criminal prosecution. *Seibert*, 542 U.S. at 605; *see also Hickman*, 157 Wn. App. 772-75 (interpreting the holding in *Seibert*). Although lower federal and state courts have disagreed as to the rule espoused in the *Seibert* plurality opinion, in *Hickman* we held that "the controlling constitutional rule of *Seibert* is that which has been articulated in *United States v. Williams*, 435 F.3d 1148, 1157-58 (9th Cir. 2006)." 157 Wn. App. at 774.

In *Williams*, the Ninth Circuit Court of Appeals stated that *Seibert* requires "a trial court [to] suppress postwarning confessions obtained during a deliberate two-step interrogation where the midstream *Miranda* warning—in light of the objective facts and circumstances—did not effectively apprise the suspect of his rights." 435 F.3d at 1157. Under the *Williams*'s court's interpretation of *Seibert*, which interpretation we adopted in *Hickman*, a court addressing the admissibility of statements obtained during a two-step interrogation procedure must first determine whether the interrogating officer deliberately used the two-step procedure to undermine the effectiveness of *Miranda* warnings. *Williams*, 435 F.3d at 1158-59. This inquiry into deliberateness, however, does not require courts to evaluate the subjective intent of the interrogator. *Hickman*, 157 Wn. App. at 775. Rather, in determining deliberateness, "courts should consider whether objective evidence and any available subjective evidence, such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning." *Williams*, 435 F.3d at 1158. "Such objective evidence would include the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre and postwarning statements." *Williams*, 435 F.3d at 1159.

If a court determines that the use of the two-step interrogation procedure was deliberate, it then must "determine, based on objective evidence, whether the midstream warning adequately and effectively apprised the suspect that he had a 'genuine choice whether to follow up on [his] earlier admission.'" *Williams*, 435 F.3d at 1160 (quoting *Seibert*, 542 U.S. at 616 (Souter, J., plurality opinion)). In making this determination, courts may consider whether any curative measures were taken to insure the suspect's understanding of his or her *Miranda* rights. *Williams*, 435 F.3d at 1160-61. Such curative measures may include a significant break in time

and place between the pre- and post-*Miranda* questioning or an additional warning that the suspect's pre-*Miranda* statements could not be used against the suspect in a subsequent criminal prosecution. *Williams*, 435 F.3d at 1160-61.

Turning to the first *Williams* inquiry, the objective evidence presented at Rhoden's CrR 3.5 suppression hearing demonstrated a deliberate use of the two-step interrogation procedure. During the initial interrogation in the living room before giving *Miranda* advisements, Olesen asked the five handcuffed suspects whether there were any drugs in the home, and Rhoden admitted that he had a small quantity of methamphetamine in his bedroom. After completing his questioning of the group in the living room, Olesen escorted Rhoden to the kitchen, read Rhoden his *Miranda* advisements, and repeated the same questions he had asked in the living room, to which Rhoden answered consistently with his responses given before receiving the *Miranda* warnings. Thus, the objective evidence of "the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre and postwarning statements" all support the conclusion that the two-step interrogation procedure used here was deliberate under *Williams*, 435 F.3d at 1159.

The second *Williams* inquiry examines the effectiveness of the midstream *Miranda* warnings. In this inquiry we examine whether any curative measures were present, such as a significant break in time and place between the pre- and post-*Miranda* questioning or an additional warning that the suspect's pre-*Miranda* statements could not be used against the suspect in a subsequent criminal prosecution. *Williams*, 435 F.3d at 1160-61. The evidence at the CrR 3.5 hearing showed that there was not a significant break in time or place between the pre- and post-*Miranda* interrogation. Perhaps more importantly, the evidence also showed that Olesen did not take any additional measures to insure that Rhoden understood his *Miranda*

rights, such as advising him that his pre-*Miranda* statements could not be used against him. Accordingly, we hold that the trial court erred by failing to suppress Rhoden's post-*Miranda* statements.

## II. THE ERROR IN ADMITTING RHODEN'S STATEMENTS WAS NOT HARMLESS

The State argues that any error in admitting Rhoden's statements at trial was harmless beyond a reasonable doubt. We disagree.

"A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error." *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985). If the untainted evidence at trial was so overwhelming that it necessarily led to a finding of guilt, reversal is not required, because there is no "reasonable possibility that the use of inadmissible evidence was necessary to reach a guilty verdict." *Guloy*, 104 Wn.2d at 426. The State bears the burden of proving a constitutional error harmless beyond a reasonable doubt. *Guloy*, 104 Wn.2d at 425. The State has not met this burden.

The only untainted evidence at trial establishing Rhoden's constructive possession over the seized methamphetamine was the presence of documents containing his name in the same dresser as the methamphetamine. The State did not present any other evidence establishing that the room in which the drugs were found belonged to Rhoden. While this untainted evidence may meet sufficiency requirements to establish Rhoden's constructive possession of the seized methamphetamine, it is not so overwhelming as to necessarily lead to a finding of guilt. We therefore cannot conclude beyond a reasonable doubt that any reasonable jury would have reached the same guilty finding absent evidence of Rhoden's challenged admissions.

For these reasons, we reverse Rhoden's conviction and remand for a new trial at which his post-*Miranda* statements must be suppressed. Because we reverse Rhoden's conviction, we need not address his contention with the trial court's imposition of the legal financial obligations.

Bjorgen, J.

BJORGEN, J.

We concur:

Johanson, C.J.

JOHANSON, C.J.

Sutton, J.

SUTTON, J.