**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | DIVISION ONE |
| Respondent, | ) | |
| | ) | No. 80372-7-I |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| ROBERT LEE HARRIS, | ) | |
| | ) | |
| Appellant. | ) | |
| _____ | ) | |

DWYER, J. — Robert Harris appeals from his conviction of delivering methamphetamine in Violation of the Uniform Controlled Substances Act.[1] Harris contends that the trial court erred by denying a motion to suppress his post-Miranda[2] admission of guilt, asserting that he made the statement as the result of a two-step interrogation process designed to subvert Miranda. Additionally, Harris contends that the trial court failed to recognize its authority to impose an exceptional sentence below the standard range. We conclude that the trial court did not err in either of these respects. Accordingly, we affirm.

I

On February 18, 2017, Robert Harris was arrested for selling methamphetamine to Anthony Ducre, an undercover police officer. Prior to purchasing the drugs from Harris, Officer Ducre approached a woman named

_____

[1] Chapter 69.50 RCW.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

"Carmela" in Cal Anderson Park in Seattle's Capitol Hill neighborhood. Officer Ducre asked Carmela if she had any "clear," which is a street name for methamphetamine. Carmela offered to let Officer Ducre smoke her pipe containing methamphetamine. Officer Ducre declined and stated that he wanted to buy a larger amount of methamphetamine.

Carmela introduced Officer Ducre to Harris, who was standing on a nearby street corner. Officer Ducre told Harris that he was "looking for 20," meaning 20 dollars' worth of methamphetamine. Harris told Officer Ducre to "hold out [his] hand" and poured out .7 grams of methamphetamine from a small baggie. Officer Ducre paid Harris with a 20 dollar bill.

After the transaction, Officer Ducre walked away and signaled for uniformed officers to arrest Harris. Officers arrested Harris and recovered a 20 dollar bill and a baggie containing 1.74 grams of methamphetamine from Harris's person. A forensic scientist from the Washington State Patrol Crime Laboratory confirmed that the substance Harris provided to Officer Ducre contained methamphetamine.

Around 12:30 p.m., the police took Harris to the nearby east police precinct. Harris was initially placed in a temporary holding cell. Shortly before 2:00 p.m., Harris was questioned by Officer Matthew Blackburn in an interrogation room. Officer Blackburn first approached Harris about becoming a confidential informant. The part of the interview concerning Harris becoming a confidential informant was not recorded. Officer Blackburn testified that he does

2

not record interviews with potential confidential informants because, if released, those recordings could endanger the informant.

Officer Blackburn presented to Harris a cooperation disclaimer form and a cooperation release form. At 2:06 p.m., Harris and Officer Blackburn both signed the cooperation disclaimer form. This disclaimer form states that Harris had "entered into and completed this agreement freely, voluntarily, and knowingly and being aware of all risk(s) involved, which may be significant."

At 2:08 p.m., Harris and Officer Blackburn both signed the cooperation release form. Under this form, Harris was required to telephone Officer Blackburn by 6:00 p.m. on February 23, 2017, and complete three separate narcotics transactions from suspected drug dealers. In return, Officer Blackburn agreed to release Harris pending further cooperation and, if Harris cooperated, to not forward Harris's case to the King County Prosecuting Attorney's Office. Officer Blackburn testified that he never told Harris that he had to confess as part of the cooperation agreement.

After signing the cooperation release form, Harris remained in the room for approximately one hour. Harris was under arrest and was not free to leave. Officer Blackburn testified that, during this time, Harris did not express any desire to either speak to an attorney or refrain from giving a recorded statement.[3]

Officer Blackburn then recorded an interrogation of Harris. The entirety of this recorded interrogation lasted for two minutes between 3:14 p.m. and 3:16

---

[3] At trial, Officer Blackburn testified that he did not recall what conversations he had with Harris during this hour-long period before Harris gave a recorded confession. At the hearing on the admissibility of Harris's recorded confession, there was no testimony regarding what, if anything, Officer Blackburn and Harris discussed during this hour-long period.

p.m. During this recorded interrogation, another police officer—Officer Kristopher Safranek—was also present. Officer Blackburn read Harris the Miranda rights prior to interrogating him. After receiving the Miranda rights, Harris expressly affirmed that he understood them. Harris subsequently confessed to delivering methamphetamine. Officer Safranek testified that there were no unrecorded questions asked of Harris while Officer Safranek was in the interrogation room.

Harris was not booked into jail that day. However, because Harris did not contact Officer Blackburn to follow through with the cooperation agreement, Harris's case was forwarded to the King County Prosecuting Attorney's Office.

The State charged Harris with one count of Violation of the Uniform Controlled Substances Act for delivering methamphetamine. Harris initially entered drug court, but his case was ultimately set for trial. Following a jury trial, Harris was convicted as charged. At the sentencing hearing, Harris requested an exceptional sentence below the standard range. The trial court imposed a sentence of 20 months of incarceration, which was the low end of the standard range. Harris appeals.

II

Harris first contends that the trial court erred by denying the motion to suppress his recorded confession. Specifically, Harris asserts that his confession was made as the result of a two-step interrogation process designed to subvert the requirements of Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). We disagree.

4

A

When reviewing the denial of a motion to suppress, we first determine "whether substantial evidence supports the challenged findings of fact and whether the findings support the conclusions of law." State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). "Evidence is substantial when it is enough 'to persuade a fair-minded person of the truth of the stated premise.'" Garvin, 166 Wn.2d at 249 (quoting State v. Reid, 98 Wn. App. 152, 156, 988 P.2d 1038 (1999)). Unchallenged findings of fact are verities on appeal. State v. Broadaway, 133 Wn.2d 118, 131, 942 P.2d 363 (1997). However, "[w]e review conclusions of law from an order pertaining to the suppression of evidence de novo." Garvin, 166 Wn.2d at 249.

B

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. To assure that an accused is accorded this privilege against compulsory self-incrimination, the United States Supreme Court in Miranda set forth procedural safeguards to be employed during custodial interrogation: "In order to combat [the compelling] pressures [of custodial interrogation] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." Miranda, 384 U.S. at 467. Specifically, an accused must be clearly informed of his or her right to remain silent and right to counsel, either retained or appointed, and that any

statements made can and will be used against the individual in court.  Miranda, 384 U.S. at 467-72.  After an accused is apprised of his or her rights and given the opportunity to invoke those rights, he or she "may knowingly and intelligently waive these rights and agree to answer questions or make a statement."  Miranda, 384 U.S. at 479.  The requisite warnings and showing of waiver are "prerequisites to the admissibility of any statement made by a defendant."  Miranda, 384 U.S. at 476.

The Supreme Court has been protective of this right.  For instance, in Missouri v. Seibert, 542 U.S. 600, 617, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004), a plurality of the Court held that Miranda warnings given mid-interrogation—after the defendant had already confessed—were designed to be ineffective and, thus, the defendant's confession repeated after the warnings were given was inadmissible.  In that case, the interrogating officer first obtained the defendant's confession during a custodial interrogation that was not preceded by Miranda warnings.  Seibert, 542 U.S. at 604-05.  Then, after a 20-minute break, the officer provided Miranda warnings and again obtained the defendant's confession.  Seibert, 542 U.S. at 605.  The Court reasoned that "[b]y any objective measure . . . it is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content."  Seibert, 542 U.S. at 613.

In the aftermath of the Seibert decision, Division Two recognized a federal court's construction of the opinion:

6

> "[A] trial court must suppress postwarning confessions obtained during a deliberate two-step interrogation where the mid-stream Miranda warning—in light of the objective facts and circumstances—did not effectively apprise the suspect of his rights. . . .  This narrower test—that excludes confessions made after a deliberate, objectively ineffective mid-stream warning—represents Seibert's holding."

State v. Hickman, 157 Wn. App. 767, 774-75, 238 P.3d 1240 (2010) (first alteration in original) (quoting United States v. Williams, 435 F.3d 1148, 1157-58 (9th Cir. 2006)).  In determining whether an interrogation process deliberately subverts Miranda, courts should consider "'the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and postwarning statements.'"  Hickman, 157 Wn. App. at 775 (quoting Williams, 435 F.3d at 1159).

The Hickman court thus held that a defendant's post-Miranda statements were inadmissible because a detective's midstream Miranda warnings ineffectively apprised the defendant of his rights under the Fifth Amendment.  Hickman, 157 Wn. App. at 776.  In that case, a detective informed the defendant that they would engage in a two-part interview consisting of administrative questioning followed by an advisement of the Miranda rights and a criminal investigation concerning the defendant's suspected failure to register as a sex offender.  Hickman, 157 Wn. App. at 770.  However, during the first part of the interrogation, the detective elicited statements from the defendant indicating that he had violated the reporting requirements.  Hickman, 157 Wn. App. at 775-76.  The detective then stopped the interview, explained that they were going to shift into the criminal investigation, and advised the defendant of the Miranda

7

rights. Hickman, 157 Wn. App. at 770. The defendant then made a recorded statement. Hickman, 157 Wn. App. at 770. Division Two reasoned that the detective's "midstream Miranda warnings, without a significant break in time or place and without informing [the defendant] that his pre-Miranda statements could not be used against him in a subsequent criminal prosecution, did not [sufficiently] inform [the defendant] of his Fifth Amendment right to silence." Hickman, 157 Wn. App. at 776.

Similarly, in State v. Rhoden, 189 Wn. App. 193, 202, 356 P.3d 242 (2015), Division Two again held that a confession made after a defendant received the Miranda rights was inadmissible because it resulted from a prohibited, deliberate two-step interrogation procedure. In Rhoden, the defendant was first questioned by a police officer while he was handcuffed in his living room. 189 Wn. App. at 196. Without informing the defendant of the Miranda rights, the officer asked whether there were any drugs or guns in the residence. Rhoden, 189 Wn. App. at 196. The defendant told the police officer that there were drugs and at least one gun in his bedroom. Rhoden, 189 Wn. App. at 196. The same police officer then escorted the defendant to the kitchen, read the Miranda rights, and questioned him a second time. Rhoden, 189 Wn. App. at 196. Upon receiving the Miranda rights, the defendant confessed to having methamphetamine in his bedroom. Rhoden, 189 Wn. App. at 196. Division Two reasoned that "the objective evidence of 'the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and postwarning statements' all support

8

the conclusion that the two-step interrogation procedure used here was deliberate." Rhoden, 189 Wn. App. at 202 (quoting Williams, 435 F.3d at 1159).

C

Even viewed in light of the foregoing authority, the trial court did not err in concluding that Officer Blackburn properly administered Miranda rights to Harris and that Harris's confession was admissible. The following findings of fact entered by the trial court support its ruling:

> 14. No other questions outside of the taped interview were asked of the Defendant while Officer Safranek was present.
>
> . . . .
>
> 16. Officer Blackburn approached the Defendant after he was arrested with a proposed agreement to become a confidential informant.
>
> 17. The discussion regarding becoming a confidential informant was not recorded.
>
> 18. There was credible testimony from Officer Blackburn that it was not recorded because it can put informants in danger to do so since the audio can get disseminated causing discussions to not remain secret.
>
> . . . .
>
> 20. In the agreement, two promises were made to the Defendant. (1) police would not book him into jail on that day, and (2) charges would not be referred to the King County Prosecuting Attorney's Office if the Defendant followed up on his end of the agreement.
>
> 21. No other promises were made.
>
> 22. There was no evidence that conversation about the confidential informant agreement was coercive.
>
> 33. The Defendant providing a confession was not a term of the agreement.

Because Harris does not challenge any of these individual findings of fact, they are verities on appeal. See Broadaway, 133 Wn.2d at 131.

The trial court's findings of fact and the evidence presented during the CrR 3.5 hearing support the trial court's conclusion that Harris's Miranda rights were properly observed. Notably, Harris's situation is significantly different from that of the suspects in the Seibert, Hickman, and Rhoden decisions. In those cases, each defendant confessed both prior to and after receiving Miranda warnings. Seibert, 542 U.S. at 604-05; Rhoden, 189 Wn. App. at 196; Hickman, 157 Wn. App. at 775-76. This fact was essential to each court's holding that the defendants' post-Miranda confessions were inadmissible.

Indeed, in Seibert, the Court reasoned that "[b]y any objective measure . . . it is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds *in eliciting a confession*, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content." Seibert, 542 U.S. at 613 (emphasis added).

Likewise, in Hickman, the court reasoned that a detective's "midstream Miranda warnings . . . without informing [the defendant] that his *pre-Miranda statements* could not be used against him in a subsequent criminal prosecution, did not [sufficiently] inform [the defendant] of his Fifth Amendment right to silence." Hickman, 157 Wn. App. at 776 (emphasis added).

Finally, in Rhoden, the court reasoned that a deliberate two-step interrogation procedure occurred because of "'the timing, setting and

10

completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content *of the pre- and postwarning statements.*'" Rhoden, 189 Wn. App. at 202 (emphasis added) (quoting Williams, 435 F.3d at 1159).

Here, there is no evidence that Harris confessed prior to receiving Miranda warnings. The trial court's findings of fact and the evidence presented at the CrR 3.5 hearing indicate that Officer Blackburn's initial conversation with Harris was limited to the topic of Harris becoming a confidential informant. The trial court found that, during Officer Blackburn's initial conversation with Harris, only two promises were made: "(1) police would not book him into jail on that day, and (2) charges would not be referred to the King County Prosecuting Attorney's Office if the Defendant followed up on his end of the agreement." Officer Blackburn testified that he never told Harris that he had to give a confession as part of the cooperation agreement. Likewise, the trial court found that Harris "providing a confession was not a term of the agreement." As the trial court found, "[t]here was no evidence that conversation about the confidential informant agreement was coercive."

Indeed, the evidence and findings of fact indicate that Officer Blackburn's interrogation of Harris was limited to what was contained in the recording. Officer Safranek—who was present for the recorded interrogation—testified that there were no unrecorded questions asked of Harris while Officer Safranek was in the interrogation room. Similarly, the trial court found that "[n]o other questions outside of the taped interview were asked of the Defendant while Officer Safranek was present." Therefore, there is nothing in the record indicating that

11

Harris confessed to delivering methamphetamine prior to receiving the Miranda warnings.

Because the record is devoid of evidence that Harris made an incriminating statement prior to receiving the Miranda warnings, Officer Blackburn did not engage in a deliberate, two-step interrogation procedure designed to subvert the requirements of Miranda as prohibited by Seibert. Therefore, when Officer Blackburn read Harris the Miranda rights, Harris was "'effectively apprise[d] . . . of his rights.'" Hickman, 157 Wn. App. at 774 (quoting Williams, 435 F.3d at 1157-58).

Accordingly, the trial court did not err by admitting Harris's confession.

III

Harris next contends that the trial court erroneously concluded that it lacked the authority to impose an exceptional sentence below the standard range. In particular, Harris asserts that the trial court was authorized by State v. Alexander, 125 Wn.2d 717, 888 P.2d 1169 (1995), to impose an exceptional sentence. We disagree.

A

A standard range sentence generally cannot be appealed. RCW 9.94A.585(1). But when "a defendant has requested an exceptional sentence below the standard range, we may review the decision if the [trial] court either refused to exercise its discretion at all or relied on an impermissible basis for refusing to impose an exceptional sentence." State v. Khanteechit, 101 Wn. App. 137, 138, 5 P.3d 727 (2000). Accordingly, we may review a trial court's

imposition of a sentence within the standard range if "[the trial court] erroneously believed it lacked the authority to [impose an exceptional sentence]." State v. McGill, 112 Wn. App. 95, 100, 47 P.3d 173 (2002). However, "a trial court that has considered the facts and has concluded that there is no basis for an exceptional sentence has exercised its discretion, and the defendant may not appeal that ruling." State v. Garcia-Martinez, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997).

B

In State v. Alexander, our Supreme Court affirmed an exceptional sentence below the standard range imposed upon a defendant convicted of delivering a controlled substance. The defendant approached an undercover police officer and asked if he wanted to buy cocaine. Alexander, 125 Wn.2d at 719. The police officer asked for 20 dollars' worth, and the defendant led the police officer to a donut shop to meet another man who had cocaine. Alexander, 125 Wn.2d at 719. The police officer attempted to pay the other man directly for the cocaine, but the defendant intercepted the money, keeping $5 for himself and giving $15 to the other man. Alexander, 125 Wn.2d at 719. In exchange for the $15, the man gave the defendant .03 grams of cocaine, which the defendant then passed to the police officer. Alexander, 125 Wn.2d at 719. The court held that the trial court properly imposed an exceptional sentence because: (1) the crime involved "an extraordinarily small amount of a controlled substance"; and (2) the defendant had a "low level of involvement" in the drug transaction. Alexander, 125 Wn.2d at 721-22.

13

C

Here, the trial court did not erroneously believe that it lacked authority to impose an exceptional sentence. Rather, it determined that Alexander was factually distinguishable from Harris's case in significant ways. First, during the sentencing hearing, the trial court stated that Alexander "involved someone with much less participation in the drug deal than [Harris]." Whereas the defendant in Alexander acted as an intermediary to a drug transaction, Alexander, 125 Wn.2d at 719, Harris dealt drugs directly to an undercover police officer. In addition, the trial court concluded that there was "also a much smaller amount of drugs in [Alexander]." Indeed, in Alexander, the defendant transferred .03 grams of cocaine. 125 Wn.2d at 719. Harris, on the other hand, transferred .7 grams of methamphetamine and had an additional 1.74 grams on his person. In determining that Alexander did not control the disposition of Harris's sentence, the trial court "considered the facts and . . . concluded that there [was] no basis for an exceptional sentence." Garcia-Martinez, 88 Wn. App. at 330. In so doing, the sentencing court did not err.

Accordingly, Harris may not appeal the standard range sentence imposed upon him.

Affirmed.

We concur: