IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80308-5-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| RAMOS, JEANNENE LEE, | ) | UNPUBLISHED OPINION |
| DOB: 10/03/1980, | ) | |
| | ) | |
| Appellant. | ) | |

BOWMAN, J. — Jeannene Lee Ramos appeals her conviction for one count of possession of a controlled substance. Ramos argues that the court should have suppressed evidence supporting her conviction as fruit of a pretextual traffic stop and that her statements to police resulted from unlawful custodial interrogation. Because the totality of circumstances shows a valid warrantless traffic stop and timely advisement of Miranda[1] warnings, we affirm her conviction.

FACTS

On February 17, 2017, Monroe Police Department Officer Scott Kornish was assigned to the crime prevention unit. While patrolling the Walmart parking lot in his unmarked SUV,[2] Officer Kornish noticed a passenger sitting alone in a car. Officer Kornish was about 100 yards from the car so he used binoculars to

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] Sport utility vehicle.

Citations and pin cites are based on the Westlaw online version of the cited material.

read its license plate. As a person with bags returned to the car, Officer Kornish looked up the license plate number and discovered a person named Mitchell Havens bought the car about four months earlier but did not transfer the car's title with the Department of Licensing. Because failure to transfer a title within 45 days of purchase is a misdemeanor crime, Officer Kornish decided to stop the car and investigate the failure to transfer title.

The car began driving out of the parking lot and onto the public road. Officer Kornish tried to catch up with the car. He testified that he had to drive up to 50 miles per hour in a 25-mile-per-hour zone to gain distance on the car. He estimated the car was travelling about 45 miles per hour while he pursued it. Once behind the car, Officer Kornish activated his emergency lights and the driver pulled over and stopped.

Officer Kornish contacted the driver, who identified himself as Steven Packer. Officer Kornish realized that he had previous contact with Packer in 2016. At that encounter, Packer's girlfriend was present and she had an active warrant for her arrest.

Officer Kornish told Packer that he did not transfer the title to the car within 45 days and that he was speeding. Packer said that the car was not his and that his girlfriend Ramos recently bought the car. Ramos was sitting in the passenger seat. Officer Kornish asked Packer for his driver's license. Packer told Officer Kornish that it was suspended.

Officer Kornish returned to his SUV to confirm that Packer's license was suspended. He also called for another officer as backup. After confirming the

2

suspended license, Officer Kornish returned to the car and placed Packer under arrest. He handcuffed Packer and read him his Miranda warnings. After asking Packer a few questions, Officer Kornish contacted Ramos in the passenger seat.

As Officer Kornish approached the passenger side of the car, he saw that Ramos had opened the door and angled her legs toward him. He questioned Ramos about the car title. Ramos confirmed she had recently bought the car but could not produce a title, bill of sale, or the name of the person who sold it to her. Officer Kornish obtained Ramos' identification and returned to his SUV to "run" her information.

As Officer Kornish was inputting Ramos' name into his computer, the backup officer arrived and walked to the passenger side of the car where Ramos sat. Officer Kornish heard the backup officer yell and saw the officer grab a gun out of the passenger side of the car. The backup officer told Officer Kornish that Ramos was concealing the weapon underneath her leg, "between her leg and the [car's] seat." The gun had a fully loaded magazine but did not have a bullet in the chamber. Officer Kornish removed Ramos from the car, placed her in handcuffs, and read her Miranda warnings. Officer Kornish then questioned Ramos about the gun. Ramos claimed she did not know the gun was on the seat.

Officer Kornish returned to his SUV to finish checking Ramos' information in the police computer system and learned Ramos had a prior felony drug conviction and a current nonextraditable warrant. Officer Kornish told Ramos she had a felony conviction and could not possess a firearm. Ramos repeated

3

that she did not know the gun was in the car. Officer Kornish challenged her story and Packer claimed the gun was his. Officer Kornish arrested Ramos for unlawful possession of a firearm and again read her Miranda warnings.

Officer Kornish saw drug paraphernalia in the car and asked Ramos whether she uses drugs. Ramos admitted that she used methamphetamine and that she had a pipe with methamphetamine residue in her purse. Ramos said that Packer sometimes used methamphetamine as well.

Officer Kornish eventually released Packer and Ramos but impounded the car and applied for a search warrant. A search of the car pursuant to a warrant yielded methamphetamine paraphernalia with drug residue, a scale with drug residue, and "baggies and bindles" of suspected methamphetamine inside a sunglasses case under the driver's seat. In a purse found inside the car near the front passenger seat, officers found a loaded gun, three baggies with suspected methamphetamine, a glass pipe, and a digital scale.

The State charged Ramos with one count of possession of a controlled substance. The trial court held CrR 3.5 and CrR 3.6 hearings to determine the admissibility of Ramos' statements to police and the evidence found in the car. The trial court found the statements and evidence admissible and entered findings of fact and conclusions of law.

Ramos submitted her case to the court as a stipulated bench trial. The court convicted her as charged and entered findings of fact and conclusions of law. Ramos appeals.

ANALYSIS

Ramos argues that the trial court erred in admitting her statements to police and the evidence recovered after her unlawful seizure. We review a trial court's conclusions of law pertaining to suppression of evidence de novo. State v. Carneh, 153 Wn.2d 274, 281, 103 P.3d 743 (2004). We review a trial court's findings of fact for substantial evidence. State v. Levy, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006). But because Ramos does not challenge the trial court's findings of fact, we treat them as verities on appeal. State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

Pretextual Stop

Ramos argues the initial seizure of her car was pretextual because Officer Kornish initiated the traffic stop based on the belief that the people in the car were involved in drug-related activity. We disagree.

A traffic stop, no matter how brief, constitutes a seizure under constitutional analysis. State v. Ladson, 138 Wn.2d 343, 350, 979 P.2d 833 (1999). That seizure extends to everyone in the vehicle. State v. Marcum, 149 Wn. App. 894, 910, 205 P.3d 969 (2009). The Washington Constitution prohibits warrantless seizures unless they fall within narrowly drawn exceptions. Art. I, § 7; State v. Arreola, 176 Wn.2d 284, 292, 290 P.3d 983 (2012). But warrantless "investigative" traffic stops are constitutional if they are "based upon at least a reasonable articulable suspicion of either criminal activity or a traffic infraction" and only if they are "reasonably limited in scope." Arreola, 176 Wn.2d at 292-93 (citing Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). The

reasonable articulable suspicion of unlawful activity must be individualized. State v. Thompson, 93 Wn.2d 838, 841, 613 P.2d 525 (1980). A Terry stop is permissible "only because such stops are reasonably necessary to enforce the traffic regulations suspected of being violated, in order to further the governmental interest in traffic safety and the general welfare." Arreola, 176 Wn.2d at 295.

Pretextual traffic stops are unconstitutional under article I, section 7. See Ladson, 138 Wn.2d at 358. An investigative Terry stop is pretextual when used as "a mere pretext to dispense with [a] warrant when the true reason for the seizure is not exempt from the warrant requirement." Ladson, 138 Wn.2d at 358. Pretextual stops are seizures without the authority of law, and any resulting evidence is inadmissible. Ladson, 138 Wn.2d at 358, 360. When considering whether a stop is pretextual, courts must examine the totality of the circumstances, including the subjective intent of the officer and the objective reasonableness of the officer's behavior. Ladson, 138 Wn.2d at 358-59. We recognize that officers may have mixed motives in initiating traffic stops. But even a mixed-motive stop does not violate article I, section 7, "so long as the police officer making the stop exercises discretion appropriately." Arreola, 176 Wn.2d at 298. If the officer "makes an independent and conscious determination that a traffic stop to address a suspected traffic infraction is reasonably necessary in furtherance of traffic safety and the general welfare, the stop is not pretextual." Arreola, 176 Wn.2d at 298-99.

6

Ramos claims that Officer Kornish's seizure of her car was pretextual because his role in the crime prevention unit was solely to investigate drug-related crimes. She argues that Officer Kornish "was not a traffic enforcement officer" and that "[h]is interest in the car was not because he was concerned about a traffic violation, but because he believed the occupants of the vehicle were involved in drug related criminal activity." The record does not support her argument.

Officer Kornish testified that his "[p]roactive patrol unit" does "directed patrol," including working parking lots, "problem houses," and other areas of high theft and high crime. He explained that most "street crimes" such as vehicle prowls, burglaries, shoplifting, and organized retail theft "revolve around illegal drug use." As a result, much of the crime prevention unit's work eventually circles back to illegal drugs. However, this does not mean that every contact made by members of the unit is solely to investigate drug-related crimes.

Here, Officer Kornish was on routine patrol, watching parking lots for evidence of organized retail theft. While in the Walmart parking lot, he noticed the car with a lone occupant. He testified that "[g]enerally[,] people go shopping together," so "[i]t's usually peculiar when people are left in a car." He ran the license plate on the car and discovered that it had been sold but the title had not been transferred. Although the car drew Officer Kornish's attention as part of his proactive unit duties, the unchallenged findings of fact show that Officer Kornish decided to stop the car to investigate the crime of failing to transfer the title within 45 days. Once on the public roadway, Officer Kornish also had reasonable

grounds to stop the car for excessive speed. Ramos fails to show that Officer Kornish subjectively intended to stop her car for any reason other than to investigate those potential law violations or that his actions were objectively unreasonable. The trial court did not err in denying Ramos' motion to suppress evidence under CrR 3.6.

Custodial Interrogation

Ramos contends Officer Kornish should have read her Miranda warnings before questioning her about the status of the car's title "[b]ecause her seizure within the car was custodial" at that point. She argues the questions put to her "before the officer warned her against self-incrimination must be suppressed." She also argues that the court should have suppressed the statements she made after Officer Kornish read her Miranda warnings as the product of an unconstitutional "two-step" interrogation. We disagree.

The federal and Washington State constitutions guarantee the right against self-incrimination. U.S. CONST. amends V, VI, XIV; WASH. CONST. art. I, § 9. Miranda warnings were developed to protect the right against self-incrimination "while in the coercive environment of police custody." State v. Heritage, 152 Wn.2d 210, 214, 95 P.3d 345 (2004). To serve this purpose, Miranda warnings must be given before custodial interrogation of a criminal suspect by an agent of the state. Heritage, 152 Wn.2d at 214. We presume statements obtained in violation of Miranda requirements are involuntary. Heritage, 152 Wn.2d at 214.

For purposes of Miranda, "custodial" refers to "whether a defendant's movement was restricted at the time of questioning." State v. Lorenz, 152 Wn.2d 22, 36, 93 P.3d 133 (2004). The objective measure of custody is whether a reasonable person would believe they are in custody "to a degree associated with formal arrest." Lorenz, 152 Wn.2d 36-37.

Ramos cites State v. Rankin, 151 Wn.2d 689, 92 P.3d 202 (2004), and State v. Young, 167 Wn. App. 922, 275 P.3d 1150 (2012), in support of her argument that she was seized while in the car and should have been read Miranda warnings before she was questioned about the car's title. Rankin addressed whether a request for a passenger's driver's license is a seizure that must be supported by a "reasonable basis" for the inquiry. See Rankin, 151 Wn.2d at 699, 697. Similarly, Young considered whether the actions of officers rose to the level of an investigative detention requiring reasonable articulable suspicion. Young, 167 Wn. App. at 931.

In relying on Rankin and Young, Ramos conflates seizure for the purpose of an investigatory detention with custody for the purpose of Miranda warnings. While a Terry stop constitutes a seizure under constitutional analysis, it is " 'substantially less "police dominated" ' " than police interrogations contemplated by Miranda. Heritage, 152 Wn.2d at 218 (quoting Berkemer v. McCarty, 468 U.S. 420, 439, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984)). An investigatory detention does not convert into a custodial arrest requiring a Miranda warning just because the suspect is not free to leave. Marcum, 149 Wn. App. at 910.

> [A] detaining officer may ask a moderate number of questions
> during a Terry stop to determine the identity of the suspect and to

9

confirm or dispel the officer's suspicions without rendering the suspect "in custody" for the purposes of Miranda.

Heritage, 152 Wn.2d at 218.

Here, after seizing the car, Officer Kornish told Packer that he did not timely transfer the title for the car. Packer told Officer Kornish that Ramos owned the car. Thus, Officer Kornish had individualized, reasonable, articulable suspicion to detain Ramos to investigate the crime of failure to transfer title. Officer Kornish questioned Ramos only about whether she owned the car and the status of the car's title. Ramos remained in the car during the conversation. Officer Kornish did not handcuff her or place her under arrest. Officer Kornish's questions to Ramos about the purchase of the car and the status of its title fell under a Terry investigation and did not amount to custodial interrogation. A Miranda warning was unnecessary. See Heritage, 152 Wn.2d at 219.

Ramos cites State v. Rhoden, 189 Wn. App. 193, 356 P.3d 242 (2015), to contend she was subject to an unconstitutional "two-step interrogation." In Rhoden, the police interrogated and handcuffed a group of suspects without reading them Miranda warnings. Rhoden, 189 Wn. App. at 196. Based on the defendant's answers, police removed only him to a different room, read him Miranda warnings, and asked the same questions again. Rhoden, 189 Wn. App. at 196. The court held that both the pre- and post-Miranda statements were inadmissible because of the deliberate procedure used by the police to undermine the effectiveness of the Miranda warnings. Rhoden, 189 Wn. App. at 200-02.

Ramos' reliance on <u>Rhoden</u> is misplaced. Officer Kornish lawfully questioned Ramos about her car title as part of a noncustodial <u>Terry</u> investigation. The discovery of the gun hidden underneath Ramos' leg and her subsequent removal from the car and restraint in handcuffs elevated the seizure to one associated with custodial arrest. Officer Kornish then immediately read Ramos her <u>Miranda</u> warnings. Ramos said that she understood the warnings and freely answered questions.

Officer Kornish's questions post-<u>Miranda</u> focused on a different topic—the gun and eventually the drug paraphernalia in her car. Officer Kornish did not deliberately subject Ramos to a two-step procedure to undermine the effectiveness of her <u>Miranda</u> warnings. The trial court did not err in concluding that Ramos' statements both pre- and post-<u>Miranda</u> were admissible.

We affirm Ramos' conviction for possession of a controlled substance.

_____

WE CONCUR:

_____          _____

11