# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

<table>
<tr><td>THE STATE OF WASHINGTON,<br><br>                    Respondent,<br><br>   v.<br><br>SETH T. CRUM,<br><br>                    Appellant.</td><td>No. 82764-2-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION</td></tr>
</table>

APPELWICK, J. — Crum appeals a series of convictions following Crum assaulting and threatening his girlfriend in their home. He argues that statements he made to police before Miranda[1] warnings should be suppressed because he was in custody. He argues that statements he made after Miranda warnings should be suppressed as a result of an improper two-step interrogation. Crum also alleges the State did not meet its burden for felony harassment, as it did not prove that his threat to his girlfriend constituted a "true threat." Finally, he argues that the court abused its discretion by imposing a $900 fine without analyzing Crum's ability to pay. We affirm.

## FACTS

Seth Crum and Tara Davis were in a relationship and the two lived together. Davis worked as a pharmacy technician, and Crum was a disabled veteran on disability for post-traumatic stress disorder (PTSD). On August 6, 2018, Crum and Davis got into an argument about cleaning their home. Davis became frustrated

---

[1] Miranda v. Arizona, 384 U.S. 436, 476, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

with Crum, and asked him to leave the home. Instead of leaving, Crum blocked the doorway to prevent Davis from leaving. Davis attempted to exit the room to call 911. Crum threw Davis on the bed and began to strangle her, causing her to temporarily lose consciousness. Crum also pinned Davis's arm back and told her that she "always start[s] problems." Davis attempted to fight back, while struggling to reach her phone in her back pocket so she could dial 911. Crum took Davis's phone and threw it on the ground, smashing and breaking it. Davis ran to the window in the room and tried to break it to escape.

Davis testified that while she tried to escape from the room Crum told her that he could hurt her family and that he would crash their car with Davis and her kids in it over a cliff. Davis interpreted this as driving her over a bridge nearby their home. Crum testified that he meant his "drive off a cliff" statement as a metaphor for their relationship, a statement to express that he felt Davis did not want him around anymore. Crum also testified that he made the statement because "it felt like she wanted me to frigging die." Davis testified that Crum made the cliff comment "very sternly," and that she believed that Crum would hurt her. She said, "Marines especially say what they mean and mean what they say."

During the fight, Davis realized if she kept fighting back, it would only get worse. When things calmed down, Davis told Crum she wanted to go to the hospital because her back hurt. Crum offered Davis a beer, which she refused. Crum testified that he made the comment about driving off a cliff around this time, after things calmed down. Crum offered to drive her to the hospital, but Davis refused. Crum allowed Davis to leave, and she drove herself to the hospital.

Deputy Nathan Conley received a call from the hospital about a physical domestic dispute that occurred. Deputy Conley interviewed Davis, who showed him her injuries and told him that Crum threatened to drive her off a cliff. Deputy Conley contacted Crum at the house. Deputy Conley knew Crum from a prior mental health crisis call and was aware Crum had PTSD from his time in the Marines.

Crum came outside, and he, Deputy Conley, and another officer had a calm and civil interaction, although Deputy Conley admits Crum seemed reluctant to talk to them. Deputy Conley said he wanted to hear Crum's side of the story of what had occurred between him and Davis. He asked Crum to sit, and Crum took a seat in a lawn chair. Crum testified that he did not feel like he could break off the conversation with Deputy Conley. However, Crum admits that the officers never told him he could not walk away. Deputy Conley testified this was akin to a Terry stop. Terry v. Ohio, 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Deputy Conley noted their conversation was "sometimes unintelligible" due to Crum speaking quietly to the ground instead of directly to him. He testified that he asked Crum about the incident with Davis earlier that day, the nature of the fight, and if he could go inside to investigate.

Crum told Deputy Conley that he could go inside to look for information and evidence related to the earlier fight. Inside, Deputy Conley took photos of Davis's broken cell phone. He exited the house and placed Crum under arrest. After transporting Crum to the precinct, Deputy Conley took Crum into an interview room and advised him of his Miranda rights. Deputy Conley testified that Crum did not

appear confused about the rights or have any questions about them. Crum waived his rights. Deputy Conley then asked him questions about the earlier events. Crum admitted to smashing Davis's cell phone and making statements about driving himself and Davis off a cliff. At the station, Crum told Deputy Conley that he meant the cliff statement as a joke. At some point, either at the home or at the station,[2] Crum testified he told the officer his reasoning for mentioning driving the car off the cliff was, "I thought that's what she wanted—she wanted me to go crazy so she could get benefits out of me or something. I don't know to be honest with you."

Crum was charged with assault in the second degree (domestic violence), unlawful imprisonment (domestic violence), felony harassment (domestic violence), malicious mischief in the third degree (domestic violence), and interfering with the reporting of domestic violence (domestic violence). At the CrR 3.5 hearing, the court admitted the statements Crum made at the house and at the station. A jury convicted Crum of all five crimes. The trial court ordered Crum to prison for 25 months, and to pay $900 of fines under RCW 9A.20.021.

DISCUSSION

I.  Pre- and Post-_Miranda_ Statements

Crum argues that the statements he made to Deputy Conley, both at his house and at the police station, should have been suppressed at the CrR 3.5 hearing. The statements Crum made at home should have been suppressed, Crum states, because he was being interrogated by Deputy Conley while in

---

[2] It is unclear in the record where these comments took place.

custody and was not free to leave. The statements Crum made at the station should have been suppressed, Crum further argues, because Deputy Conley asking post-Miranda questions at the station was a prohibited two-step interrogation process.

A. Custody

First, Crum argues that his constitutional rights were violated when statements he made to Deputy Conley at the house were not suppressed, because he was interrogated in custody without Miranda warnings.

This court reviews de novo a trial court's determination that police did not obtain a confession in violation of Miranda. State v. Johnson, 94 Wn. App. 882, 897, 974 P.2d 855 (1999). The Fifth Amendment to the United States Constitution provides criminal suspects with the right to be free from self-incrimination. State v. Rhoden, 189 Wn. App. 193, 199, 356 P.3d 242 (2015). To protect against self-incrimination, law enforcement officers are required to provide Miranda warnings before questioning a suspect that is in custody. Id. Statements made during a custodial interrogation without Miranda warnings cannot be used against the suspect at trial. Id. For purposes of Miranda, "'[c]ustodial' refers to whether the defendant's movement was restricted at the time of questioning." State v. Lorenz, 152 Wn.2d 22, 36, 93 P.3d 133 (2004). Washington courts use an objective test to determine whether a suspect is in custody for purposes of Miranda. State v. Heritage, 152 Wn.2d 210, 218, 95 P.3d 345 (2004). Courts look to whether a reasonable person in the same situation would feel that his or her freedom was curtailed to the degree associated with a formal arrest. Id.

A <u>Terry</u> stop is a brief and public questioning by an officer that does not require <u>Miranda</u> warnings. <u>Id.</u> An officer may briefly stop a suspect, where reasonable person would not feel free to leave, without putting them in custody under <u>Miranda</u>. <u>Id.</u> The officer can ask "a moderate number of questions" to determine the identity of the suspect and to "confirm or dispel the officer's suspicions." <u>Id.</u>

In determining whether a stop amounted to a <u>Terry</u> stop or custody under <u>Miranda</u>, courts look to the duration of the stop. <u>State v. France</u>, 129 Wn. App. 907, 910, 120 P.2d 654 (2005). In <u>France</u>, officers told a suspect he was free to leave only after "the matter was cleared up." <u>Id.</u> at 910-11. The court found this to be an open-ended, unlimited duration of questioning. <u>Id.</u> The possibility of unlimited questioning paired with the fact that the officers had probable cause to make an arrest before questioning, resulted in custody that required <u>Miranda</u> warnings. <u>Id.</u> In contrast, in <u>Heritage</u>, a suspect was not in custody when an officer asked her in public, "Whose marijuana pipe is this?" 152 Wn.2d at 213. The court in <u>Heritage</u> found that the public nature of the interrogation and the fact the officers asked only a moderate number of questions amounted to a <u>Terry</u> stop rather than in custodial detention, requiring <u>Miranda</u> warnings. <u>Id.</u> at 219.

Crum argues that he was in custody because the officers did not tell him he was free to leave. But, an explicit statement that he was free to leave was unnecessary. <u>See, e.g.</u>, <u>id.</u> Moreover, an investigatory detention does not convert into a custodial arrest requiring a <u>Miranda</u> warning merely because the suspect is not free to leave. <u>State v. Marcum</u>, 149 Wn. App. 894, 910, 205 P.3d 969 (2009).

6

Deputy Conley testified that the conversation at Crum's home was a Terry stop. The questioning took place outside the house, on the front porch. The stated purpose of the questions was to get his side of the story. The testimony reflects only a few questions were asked: whether Crum had fought with Davis, the nature of their fight, and whether Deputy Conley could enter the house to investigate further. The brief nature of questioning, the public area, and the questions related to Deputy Conley's suspicions support a conclusion that this stop amounts to a Terry stop. Crum was not in custody when Deputy Conley asked him questions outside his house, so Miranda warnings were not needed. Crum's constitutional rights were not violated when his motion to suppress was denied.

B. Two-step Interrogation

Crum claims that Deputy Conley engaged in an improper two-step interrogation when he questioned Crum both outside the house and at the station. Because of this, he argues his post-Miranda statements at the station should be suppressed. The State counters that a two-step interrogation occurs only when both questionings take place in custody.

A two-step interrogation occurs when an officer asks questions before giving a Miranda warning, the suspect confesses, and the officer gives the Miranda warning followed by a repetition of the confession. United States v. Williams, 435 F.3d 1148, 1154 (9th Cir. 2006). Courts look to whether the interrogating officer deliberately used a two-step interrogation to avoid giving Miranda warnings. Rhoden, 189 Wn. App. at 200-01. A two-step interrogation occurs only when both

rounds of questioning take place in custody. United States v. Barnes, 713 F.3d 1200, 1204-5 (9th Cir. 2013).

When Crum spoke with Deputy Conley outside his house, he was not in custody. Therefore, no two-step interrogation took place. The trial court properly declined to exclude both Crum's pre- and post-Miranda statements.

II. True Threat

Crum asserts that the State failed to prove beyond a reasonable doubt that Crum made a "true threat" to Davis, which is an element of his felony harassment charge. The State argues it met its burden of proof, as the evidence demonstrates that a reasonable person would have taken Crum's statements as a true threat.

To prove harassment, the State needs to show that Crum knowingly threatened Davis with bodily injury, and that Davis was in reasonable fear that the threat would be carried out. RCW 9A.46.020(1). Under this statute, only a "true threat" is prohibited. State v. Kilburn, 151 Wn.2d 36, 43, 84 P.3d 1215 (2004). True threats are not protected speech under the First Amendment. Id.

Courts use an objective test to determine a true threat. Id. Under this test, "[a] 'true threat' is 'a statement made in context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or take the life of another person.'" State v. Boyle, 183 Wn. App. 1, 7-8, 335 P.3d 954 (2014) (alteration in original) (internal quotation marks omitted) (quoting State v. Locke, 175 Wn. App. 779 789, 307 P.3d 771 (2013)). Under the objective test,

8

courts do not find jokes or hyperbolic statements to be threats. Kilburn, 151 Wn.2d at 39; State v. Schaler, 169 Wn.2d 274, 283, 236 P.3d 858 (2010).

Whether a true threat was made is determined by the sufficiency of the evidence. Boyle, 183 Wn. App. at 6. Because analysis of a true threat has constitutional implications, review is "a limited independent review of facts crucial to the true threat inquiry." State v. Kohonen, 192 Wn. App. 567, 577, 370 P.3d 16 (2016). Sufficient evidence supports a true threat if, after viewing the evidence in the light most favorable to the State, any rational trier of fact could find a true threat beyond a reasonable doubt. Id.

Courts will review a true threat under the totality of the circumstances. Boyle, 183 Wn. App. at 8. Not only the words and phrasing matter, but "the larger context in which the words were uttered, including the identity of the speaker, the composition of the audience, the medium used to communicate the alleged threat, and the greater environment in which the alleged threat was made." Kohonen, 192 Wn. App. at 580. "When assessing whether a reasonable person in the speaker's position would foresee a statement interpreted as a serious threat, we look at the speaker's actual intended audience, not a reasonable audience or an unintended recipient." State v. D.R.C., 13 Wn. App. 2d 818, 825, 467 P.3d 994 (2020)

Crum argues that he made vague and hyperbolic statements to Davis, and that she could not reasonably infer he was seriously threatening her. The relevant question here is whether a reasonable person in Crum's position would have understood that the statements about driving Davis and her children off a cliff

would be interpreted as a serious expression of intent to physically harm Davis and her children.

Crum cites Kilburn and D.R.C. in support of his claim that his statements were hyperbolic and not serious. In Kilburn, a student laughingly made comments about bringing a gun to school. 151 Wn.2d at 39, 52. Because of Kilburn's recognized joke-making past, and his laughing during delivery of the comments, the Washington Supreme Court held that a reasonable person would not interpret his comments as a threat. Id. at 52-53. Similarly, in D.R.C., a daughter texted her friends that she was going to kill her mother. 13 Wn. App. 2d at 821-22. Other texts threatening an acquaintance were filled with emojis[3] and language indicating that D.R.C. did not intend her language as a serious threat. Id. at 823, 828. Because the threatening language was inlaid with humorous language and emojis to represent that she was kidding, the court did not find that D.R.C. made a true threat. Id. at 828.

Kilburn and D.R.C. are inapposite. There is no evidence that Crum was laughing or indicated to Davis that he was only kidding. The threats were not made in a light-hearted moment. They were made in the context of a physical altercation, in which he had strangled her to the point of unconsciousness. And, when she regained consciousness and tried to make a phone call, he seized the phone and smashed it. He blocked her attempt to leave. Nothing about this situation suggests that Crum made this statement merely in jest or exaggeration.

---

[3] An "emoji" is a small symbol or image used in electronic communication, including text messaging, to convey information or the writer's emotions.

10

We look to whether a reasonable person in Crum's position could foresee that Davis would interpret his statements as true threats. D.R.C., 13 Wn, App. 2d at 825-26. Davis testified that she wanted to go to the hospital. Crum stated that he wanted to drive her. She feared that he meant to drive her off the bridge they would have to cross on the way to the hospital. She stated that she believed he actually would do it because "Marines especially say what they mean and mean what they say." Further, Davis testified that Crum had physically assaulted her in the past. She also stated that Crum was angrier than usual that night. On this record, a reasonable person in Crum's shoes would foresee that Davis would take this threat seriously.

Viewed in the light most favorable to the State, the State proved that Crum made a true threat to Davis beyond a reasonable doubt.

III.   Legal Financial Obligations

Crum argues that, under State v. Blazina, the court abused its discretion when it imposed $900 of discretionary legal financial obligations (LFOs) on him without analyzing his ability to pay. 182 Wn.2d 827, 344 P.3d 680 (2015).

In Blazina, the Supreme Court of Washington held that before a court orders discretionary LFOs under RCW 10.01.160(3), it must conduct an inquiry on the defendant's ability to pay. Id. at 839. However, Blazina applies only to discretionary LFOs and costs under RCW 10.01.160, and not fines. State v. Clark, 191 Wn. App. 369, 376, 362 P.3d 309 (2015). And, in Clark, this court held that LFOs under RCW 9A.20.021 were considered to be fines, and did not require a trial court to analyze a defendant's financial situation before imposing the fine. Id.

RCW 9A.20.021 lists maximum fines depending on the level of crime. His three felony and two gross misdemeanor convictions exposed him to potential fines in the tens of thousands of dollars. The trial court knew Crum was indigent and stated it assumed he lacked the assets to pay the fine. But, the trial court also correctly stated that it did not believe that consideration of ability to pay under Blazina was applicable to the fine. In this case, the trial court imposed a fine of $900, less than the maximum fine for a misdemeanor.[4]

The trial court did not err by imposing the fine despite Crum's indigence.

We affirm.

_Appelwick, J._

WE CONCUR:

---

[4] We are mindful that fines, costs, and restitution are all financial assessments on a defendant and all require money or assets to pay them. It is intuitively obvious that a $900 fine could be so burdensome to a particular indigent defendant that is would constitute an abuse of discretion to impose it, just as a discretionary cost of the same amount could be. But, the considerations under Blazina have not been extended to fines. Accordingly, we find no abuse of discretion in the imposition of the $900 fine in this case.